# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|                                   |   |                         |
|-----------------------------------|---|-------------------------|
|                                   | ) |                         |
| UNITED STATES OF AMERICA          | ) |                         |
|                                   | ) |                         |
| v.                                | ) | Crim. No.  05-40021-FDS |
|                                   | ) |                         |
| LEO BEATTY,                       | ) |                         |
| Defendant.                        | ) |                         |
|                                   | ) |                         |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America (the "government") submits this memorandum to:  (i) respond to Objections to the Presentence Report filed by the defendant, Leo Beatty and (ii) set forth the government's position concerning Beatty's sentencing, which is set for September 28, 2006.

## I.    BACKGROUND

### A.    The Crack Investigation

This case stemmed from the deployment of the Drug Enforcement Administration's Mobile Enforcement Team (the "MET  Team") in Fitchburg, MA, in late 2004 and early 2005.  The investigation of the defendant, Leo Gordon Beatty ("Beatty"), began in December 2004, when a confidential informant ("CI") informed the MET Team that Beatty was selling crack cocaine in the Fitchburg area.  The CI agreed to assist in arranging controlled purchases of crack cocaine from Beatty.  Under the direction of the agents, the CI introduced Beatty to DEA Special Agent Steven Story (the "UC"), who was acting in an undercover capacity, posing as a crack cocaine customer. The CI ultimately arranged four controlled crack cocaine transactions between the UC and Beatty. Agents monitored the telephone conversations between the CI and Beatty, nearly all of which were recorded, and each transaction was audio and video recorded, as well as observed by surveillance agents.

The facts underlying the four crack cocaine transactions charged in the indictment are set forth in the Presentence Report ("PSR") at Paragraphs 9 – 50, which are incorporated by reference herein. They are also detailed in the UC's affidavit, which is attached hereto as **Exhibit 2** (Affidavit of Steven C. Story). In short, the transactions transpired as follows:

### 1.     February 10, 2005 – DEA Exhibit 86 (4.8 grams)

In early February 2005, in the presence of agents, the CI arranged a 5-gram crack cocaine transaction with Beatty by contacting Beatty at cell phone number (978) 235-0735, which was subscribed to Leo Beatty, 18 Musket Drive, Building 3, Apartment A2, Leominster, MA, during this time frame. The deal ultimately took place on February 10, 2005, when Beatty met the CI and UC at a pre-arranged location, where Beatty retrieved a package of crack cocaine from his Jeep Cherokee, which bore MA Registration 27DW02. According to records of the Registry of Motor Vehicles, the Jeep was registered to Leo Gordon Beatty, 18 Musket Drive, Apartment 2A, Leominster.

At Beatty's instruction, the UC and CI stepped into a recessed doorway on the sidewalk, where Beatty handed the package of crack cocaine to the CI, who passed it to the UC. The UC then handed $500 to the CI, who passed it along to Beatty. The CI asked Beatty if the UC could call him directly to coordinate the next drug deal, but Beatty replied that he wanted the CI to broker the next few deals, rather than deal with the UC directly. The UC examined the package that Beatty sold to him (which DEA marked as Exhibit 86) and noted that it was an off-white, chunky rock-like substance consistent with the color and appearance of crack cocaine. **Exhibit 2** at ¶ 7. The substance was submitted to the DEA lab, which determined that it contained cocaine base with a net weight of 4.8 grams. <u>See</u> Affidavit of Forensic Chemist Brian J. Hall, attached hereto **Exhibit 1**, at ¶¶ 7-8.

**2.      February 17, 2005 – DEA Exhibit 93 (7.1 grams)**

The second deal took place on February 17, 2005, when the CI called Beatty and arranged a 10-gram purchase of crack cocaine at the same location.  Shortly thereafter, the CI and UC met with Beatty, who arrived in the same Jeep Cherokee.  Once again, Beatty motioned the CI and UC to step into a recessed doorway, where the CI and UC inspected a package of crack cocaine that Beatty handed to the CI.  In exchange for the crack, the UC handed $800 to the CI, who passed it along to Beatty.

After the transaction, Beatty commented to the UC that he takes a loss in the weight of the drugs due to powder-to-crack conversion process.  Specifically, Beatty explained to the UC that "whatever I lose in cooking it, you don't lose."  **Exhibit 2** at ¶ 7.  Agents marked the substance that Beatty sold to the UC on February 17, 2005 at Exhibit 93.  Consistent with the appearance and color of crack cocaine, Exhibit 93 was chunky and rock-like in appearance and was off-white in color. Id.  DEA sent Exhibit 93 to the DEA lab, which confirmed that the substance contained cocaine base with a net weight of 7.1 grams.  **Exhibit 1** at ¶¶ 7-8.

**3.      March 3, 2005 – DEA Exhibit 99 (19.9 grams)**

In arranging the third deal, which took place on March 3, 2005, the CI asked Beatty how much a "Z" -- one ounce of crack cocaine -- would cost.  When Beatty indicated that he did not want to sell one ounce of crack cocaine to the UC, the CI asked him to make a better deal because the UC did not want to pay $1000 for only 10 grams (at $100 per gram).  Beatty replied that he could provide 12 grams of crack cocaine to the UC for $1000, then justified this high price by explaining, "[b]ecause what I pay for a Z ... and then have to cook it ... and the loss ... you know what I mean?  That's what kills me."  Again, Beatty was referring to the drug weight he lost in converting the powder cocaine into crack cocaine.  See **Exhibit 2** at ¶ 8.

Beatty ultimately sold Exhibit 99 to the UC on March 3, 2005, for $1500. During the deal, the UC weighed the package that Beatty provided on a digital scale, which registered 21 grams. Like the previous two transactions, the substance in Exhibit 99 was off-white and rock-like in appearance, and looked like crack cocaine. See **Exhibit 2** at ¶ 9. The DEA lab analyzed Exhibit 99 and determined that it contained cocaine base with a net weight of 19.9 grams. See **Exhibit 1** at ¶¶ 7-8.

4.     **March 17, 2005 – DEA Exhibit 108 (19.0 grams)**

The fourth transaction took place on March 17, 2005, when the CI placed a series of calls to Beatty to arrange another 20-gram crack cocaine transaction. During the set up call, which the UC monitored, when the CI asked Beatty to meet them for another deal, Beatty responded that he was "all out" and had to meet with his source, and then he needed time "to cook it up." See **Exhibit 2** at ¶ 10. After Beatty told the CI that he needed 20 minutes to "cook it up," they agreed to meet at the same location where the previous deals took place at 3:00 p.m., when Beatty would sell 20 grams of crack cocaine to the UC for $1500.

This time, the CI was not present for the deal, which took place in the UC's undercover vehicle. Once again, during the transaction, the UC weighed the substance that Beatty gave him on a digital scale, which Beatty asked the UC to "zero out." **Exhibit 2** at ¶ 10. Beatty then placed a package containing an off-white, rock-like substance on the UC's scale, which registered 20.3 grams. Id. Upon taking the package of crack, which was marked by DEA as Exhibit 108, the UC gave $1500 to Beatty. The color, texture and appearance of Exhibit 108 was consistent with that of crack cocaine. The DEA lab confirmed that Exhibit 108 contained cocaine base with a net weight of 19.0 grams. **Exhibit 1** at ¶¶ 7-8.

### 5.    Beatty's Arrest on May 9, 2005 – DEA Exhibit 128 (24.2 grams)

Beatty was arrested on May 9, 2005, during a 25-gram crack cocaine transaction with the UC. The transaction was never completed because Beatty was arrested before the UC gave him the money for the crack cocaine.  In arranging the transaction on a recorded telephone call, Beatty told the UC that he could supply the UC with $1500 worth of cocaine, but "it will be all powder, though." **Exhibit 2** at ¶ 11.  The UC  replied that he had been getting crack cocaine from a different source at a cheaper price, but noted that Beatty's was "cooked perfect," while the other source's crack was only "decent." In response, Beatty explained to the UC that people cook cocaine into crack cocaine in different ways, stating:

> "what they do, they run it through the first cook, and it swells ... what happens is it swells with the baking soda..... So, it looks like yellow, [a]nd it's going to weigh more than baking ... it's heavier than the stuff itself.... [O]ne day ... I'll show you how it's done.... I cook it twice to make sure everything is out of it.  That it's nothing but pure oil."

Id.  A transcript of this conversation is attached to the UC's affidavit as **Exhibit 2(A)**.  Beatty and the UC ultimately agreed that Beatty would provide 25 grams of crack cocaine to the UC on May 9, 2005, in exchange for $1650.

On May 9, 2005, the UC met with Beatty at a pre-arranged location, where Beatty provided a package of crack cocaine to the UC.  Rather than complete the exchange, a signal to arrest Beatty was made and law enforcement officers converged on Beatty's  Jeep Cherokee and arrested him.  The substance that Beatty gave to the UC, which was marked as DEA Exhibit 128, was an off-white, chunky rock-like substance, which looked like crack cocaine.  Agents sent Exhibit 128 to the DEA lab, which determined that it contained cocaine base with a net weight of 19.0 grams.  See **Exhibit 1**  at ¶¶ 7-8.

**6.      Seizures at Beatty's Residence on May 9-10, 2005 – DEA Exhibit 130 (11.3 grams)**

Finally, later that day (May 9, 2005), officers executed a search warrant at Beatty's residence at 18 Musket Drive, Building 3, Apartment 2A in Fitchburg.  Inside Beatty's residence, officers seized cut baggies with cocaine residue and various paperwork and bank records.  See **Exhibit 2** at ¶ 14.  The next day, May 10, 2005, a Leominster Police detective who assisted with the search warrant received a call from management at Heritage Gardens, the complex where Beatty resided and where the search warrant was executed.  Id.  The manager told the detective that an unnamed maintenance worker found some cocaine and a scale hidden in a hallway ceiling panel directly outside of Beatty's apartment.  The Leominster Police detective went to the apartment complex and retrieved a quantity of crack cocaine and a small digital scale.  Id.

The detective turned the crack cocaine and digital scale over to DEA.  See **Exhibit 2** at ¶ 14.  DEA marked the cracked cocaine as Exhibit 130, which the UC examined before a fellow DEA agent sent it to the DEA lab for analysis.  The substance was chunky and rock-like in appearance and off-white in color, and appeared to be crack cocaine.  Id.  The DEA lab confirmed that Exhibit 130 contained cocaine base with a net weight of 11.3 grams.  **Exhibit 1** at ¶¶ 7-8.

**B.      The Indictment and § 851 Information**

The indictment charges Beatty with four counts of possession with intent to distribute, and distribution of, cocaine base, also known as "crack cocaine," on February 10, 2005 (Count One), February 17, 2005 (Count Two), March 3, 2005 (Count Three), and March 17, 2005 (Count Four), in violation of 21 U.S.C. § 841(a)(1).   The indictment also alleged that Counts Two through Four involved 5 grams or more of "crack cocaine," triggering the 5-year mandatory minimum (and 40-year maximum) set forth in 21 U.S.C. § 841(b)(1)(B).  Id.  The total amount of "crack cocaine" charged in the indictment was 50.8 grams.

On August 30, 2005, the government filed an Information under 21 U.S.C. § 851, notifying Beatty that due to the following convictions, the enhanced penalties under 21 U.S.C. § 841(b)(1)(B) apply:

(1)     On August 4, 1994, Beatty was convicted in the Worcester Superior Court of trafficking cocaine ( Docket No. 9306861) and distributing and dispensing a Class B controlled substance, to wit, cocaine (Docket No. 9306862);

(2)     On August 15, 1994, Beatty was convicted in the Worcester Superior Court of conspiracy to violate the Controlled Substances Act by trafficking cocaine (Docket No. 9306863) and conspiracy to violate the Controlled Substances Act by distributing cocaine (Docket No. 9306866); and

(3)     On November 30, 1992, Beatty was convicted in the Worcester Superior Court of conspiracy to violate the Controlled Substances Act by trafficking cocaine (Docket No. 920094C).

As a result of these prior convictions and the filing of the § 851 Information, Beatty's statutory penalties increased to up to 30 years imprisonment on Count One (rather than up to 20 years) and up to life on Counts Two -- Four (rather than up to 40 years).  See 21 U.S.C. §§ 841(b)(1)(B)-(C), 851. As set forth below, however, because Beatty refused to plead guilty to the drug weights charged in the indictment, the enhanced penalties in § 841(b)(1)(C) -- the default provision -- apply to all four counts.

**C.     The Rule 11 Hearing**

On May 3, 2006, Beatty appeared at a Rule 11 hearing before this Court, where he pleaded guilty to Counts 1 – 4 of the indictment.  Beatty qualified his guilty plea, however, as follows:

(1)     Beatty refused to plead guilty to the drug weights alleged in the indictment (i.e, that Counts Two -- Four involved 5+ grams of crack cocaine); and

(2)     Beatty refused to admit that the substance he distributed in Counts One -- Four was "crack cocaine," admitting only that he distributed "cocaine base."

See **Exhibit 3** (Tr. of Rule 11 hr'g) at 17-21.  After a discussion with counsel, the Court accepted Beatty's guilty plea on all four counts.  The Court then asked Beatty if he was the same Leo Beatty

who was convicted of the offenses listed above.  Again, Beatty refused to accept full responsibility

for his actions.  Specifically, although he acknowledged that he is the same Leo Beatty convicted on

August 4, 1994 and August 15, 1995 of the drug felonies set forth above, he denied that he is the same

Leo Beatty who was convicted on November 30, 1992, of conspiracy to violate the Controlled

Substances Act by trafficking cocaine in Worcester Superior Court Docket No. 92-0094C:

> THE COURT:    All right.  And are you the same Leo Beatty, who was convicted on or about November 30th, 1992, in the Worcester Superior Court, Worcester, Massachusetts, of conspiracy to violate the Controlled Substances Act, by trafficking cocaine, Criminal Docket No. 92-0094C?
>
> THE DEFENDANT:    No, your Honor.
>
> THE COURT:    All right.  You deny that?
>
> THE DEFENDANT:    I deny that, yeah.

**Exhibit 3** at 28.

## D.    **The Presentence Report**

The U.S. Probation Office ("Probation") has determined that the following statutory penalties

apply:  Count One -- a maximum term of imprisonment of 30 years, and Counts Two through Four

-- a minimum term of imprisonment of 10 years and a maximum term of imprisonment of 30 years.

PSR at ¶ 158.  Probation has also determined that Beatty is accountable for 86.30 grams of crack

cocaine based on the four charged transactions (which total 50.8 grams), the crack seized from Beatty

upon his arrest on May 9, 2005 (24.2 grams), and the crack found in the ceiling panel directly outside

Beatty's apartment (11.3 grams).  PSR at ¶ 76.

Probation then calculated that Beatty's guideline sentencing range ("GSR") would have been

135-168 months (based on TOL 30 and CHC IV) had the career offender provisions not applied.

Probation determined, however, that Beatty is, in fact, a "career offender" under USSG § 4B1.1 based

on Beatty's 1992 and 1994 convictions.  PSR at ¶¶ 85, 97.   The PSR sets forth the following GSR:

| | |
|---|---|
| Base Offense Level: | 34 (based on USSG § 4B1.1(B)) |
| § 3E1.1 Adjustment: | -2  (because no "extra point" motion by government) |
| Total Offense Level: | 32 |
| Criminal History Category: | VI (based on USSG § 4B1.1) |

-------------------------------------------------------------------------------------------

**210 -- 262 months**

See PSR at ¶¶ 86-87, 97, 159.

## II.   ARGUMENT

### A.   Government's Sentencing Recommendation

The government agrees with the statutory and USSG calculations set forth in the PSR with two

exceptions:  First, for all of the reasons set forth in Government Objection #1 (in the Addendum to the

PSR), the government submits that Beatty is not entitled to <u>any</u> reduction for acceptance of

responsibility under § 3E1.1.  Second, not only is Beatty frivolously denying his 1992 prior conviction

(which affects both the § 851 Information and Beatty's status as a "career offender"), but also he did

so under oath at the Rule 11 hearing.  See **Exhibit 3** at 28.  An obstruction of justice adjustment under

USSG § 3C1.1 is therefore applicable.  Accordingly, the government believes that Beatty is subject

to the following GSR:

| | |
|---|---|
| Base Offense Level: | 34 (based on USSG § 4B1.1(B)) |
| § 3E1.1 Adjustment: | 0 |
| § 3C1.1 Adjustment | +2 |
| Total Offense Level: | 36 |
| Criminal History Category: | VI (based on USSG § 4B1.1) |

-------------------------------------------------------------------------------------------

**324 -- 405 months**

9

The government respectfully recommends that the Court impose a Guidelines sentence here. Specifically, the government recommends the following sentence:

- A period of incarceration of 324 months;
- A period of supervised release of 8 years;
- A fine of within the USSG range unless the Court waives the fine;
- A special assessment of $400; and
- Forfeiture as ordered in the Preliminary Order of Forfeiture applicable to this case.

In support of this recommendation, the government relies on: (i) this sentencing memorandum, (ii) the affidavits attached hereto, (iii) the government's objections in the PSR, and (iv) any/all evidence and/or oral argument provided at the sentencing hearing.

**B.    Defendant's Objections to the PSR**

This memorandum responds to some, but not all, of the Defendant's objections to the PSR. Responses to the more significant objections (such as Objections ## 1, 4, 5, 6, 7 and 12) are set forth below. With respect to the remaining objections (including Objections ## 2, 8, 9, 10 and 11), the government agrees with the Probation Officer's responses set forth in the Addendum to the PSR dated August 2, 2006, and reserves the right to supplement those responses at the sentencing hearing on September 28, 2006.

**1.    Objections #1 and #4  (Applicability of "Crack" Guidelines)**

Beatty's challenge to the application of the "crack cocaine" guidelines is entirely without merit and should be rejected as utterly frivolous. In Defendant's Objection #1, Beatty "object[s] to every reference to 'crack cocaine,'" stating that he pleaded guilty to "cocaine base" only, and in Defendant's Objection #4, he argues that his Base Offense Level ("BOL") should be based on <u>powder cocaine</u>, yielding a BOL 16 (for 50-100 grams of cocaine). This argument fails based on the evidence

10

presented by DEA Forensic Analyst Brian J. Hall (**Exhibit 1** and DEA Special Agent Steven C. Story

(**Exhibit 2**), including Beatty's own recorded statements.  As the First Circuit has noted:

> . . . the government may show by expert chemical analysis that a substance is cocaine base.  See Robinson, 144 F.3d at 109.  Chemical analysis cannot establish that a substance is crack, however, because crack is chemically identical to other forms of cocaine base, see id. at 108, although it can reveal the presence of sodium bicarbonate, which is usually used in processing crack, see U.S.S.G. § 2D1.1 Note (D).  Lay opinion testimony suffices to prove that a substance is crack. See Martinez, 144 F.3d at 190.

United States  v. Richardson, 225 F. 3d 46 (1st Cir. 2000); see United States v. Robinson, 144 F.3d

104, 109 (1st Cir. 1998); see also United States v. Martinez, 144 F. 3d 189, 190 (1st Cir. 1998).  In the

present case, in addition to Beatty's admission that the substances distributed were cocaine base,

Forensic Analyst Hall, in a sworn affidavit, stated that based on (i) his training and experience, (ii) his

examination of Exhibits 86, 93, 99, 108, 128 and 130, which appear in form consistent with crack

cocaine, and (iii) the DEA-7 lab reports, which describe each exhibit as containing "an off-white, rock-

like substance" and establish that the substances contain are cocaine base, Hall's opinion to a

reasonable degree of scientific certainty is that Exhibits  86, 93, 99, 108, 128 and 130 are all cocaine

base in the form of crack cocaine.  See **Exhibit 1** (with attachments).

    Furthermore, DEA Special Agent Story, who acted as the undercover agent who actually

bought the crack cocaine from Beatty, provided a sworn affidavit stating that all of  the substances

bought from Beatty were chunky and rock-like in appearance and off-white in color, and that based

on his training and experience, the substances looked like crack cocaine.   See **Exhibit 2**.

Additionally, the agents opined that based on the appearance of the controlled substances and the

terminology used in connection with the transactions, each drug deal involved the purchase of a

quantity of crack cocaine.  Moreover, Special Agent Story detailed (in both his affidavit and in

transcripts attached thereto) numerous admissions by Beatty, himself, who repeatedly made statements to both the CI and UC about "cooking," "baking," and/or "making" the crack cocaine.  See **Exhibit 2** at ¶ 7-13 (with attachments).  Beatty also referenced "baking soda" and the "loss" he incurred in drug weight by converting powder cocaine into crack cocaine.  See, e.g., **Exhibit 2** at ¶ 7, 8, 11.

In sum, Beatty's "crack" objection is utterly baseless.

## 2.    Objection # 5  (Three-Level Reduction under USSG § 3E1.1)

The government disagrees with Beatty's Objection # 5, which argues that the only legal basis for withholding the third point under USSG § 3E1.1 is "untimeliness of the plea."  For all of the reasons stated in the Government's Objection #1, Beatty is not entitled to any reduction whatsoever under § 3E1.1.  As stated by Section 3E1.1 itself, a defendant's offense level is decreased by 2 levels under  § 3E1.1(a) only "[i]f the defendant clearly demonstrates acceptance of responsibility."  USSG § 3E1.1(a) (emphasis added).  According to Application Note No. 1, in determining whether Beatty is entitled to this 2-level reduction, the Court should consider whether Beatty "truthfully admitt[ed] the conduct comprising the offense(s) of conviction, and truthfully admitt[ed] or not falsely den[ied] any additional relevant conduct." Id. at Applic. Note No. 1 (emphasis added).  The Application Note further instructs that "a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent  with acceptance of responsibility." USSG § 3E1.1, Applic. Note No. 1(a) (emphasis added).  See also United States v. McLaughlin, 378 F.3d 35, 39 (1st Cir. 2004); United States v. Saxena, 229 F.3d 1, 9 (1st Cir. 2000); United States v. Thomas, 3 Fed. Appx. 599, 601 (9th Cir. 2001); United States v. McDonald, 964 F.2d 390, 391 (5th Cir. 1992).

Here, at the Rule 11 hearing, Beatty refused to admit that:  (1) the substance at issue in the

indictment was "crack cocaine," (2) he sold over 5 grams of cocaine base in Counts Two -- Four, and (3) he is the same Leo Beatty set forth in the 1992 drug conviction listed in his § 851 Information. See Exhibit 3. As set forth above, Beatty's challenge to the nature of the controlled substance (i.e, that he sold "crack cocaine" to the UC) is utterly frivolous. As set forth below, Beatty's challenge to the drug weight is also entirely baseless. Finally, Beatty's challenge to his 1992 conviction is likewise utterly baseless. A certified copy of Beatty's 1992 prior conviction is attached hereto as **Exhibit 4**. The government also notes that: (i) the challenged 1992 conviction appears on Beatty's criminal history record, and (ii) the August 15, 1994 prior conviction to which Beatty did admit appears as a probation violation under the 1992 conviction entries, providing further proof that this conviction is, in fact, Beatty's. See **Exhibit 5** (copy of Beatty's criminal record) at 2. Finally, if Beatty continues to deny his 1992 conviction at the sentencing hearing, the government is prepared to call a fingerprint expert, who will testify that the fingerprints taken upon Beatty's arrest relating to the 1992 conviction are the same as the fingerprints taken upon Beatty's arrest in the instant case. Even without this testimony, the record clearly shows that Beatty is, in fact, the same Leo Beatty who was convicted of a state drug felony on November 30, 1992.

### 3.      Objections # 6 and # 7  (Applicability of Mandatory Minimum)

Beatty's objection to application of the 10-year mandatory minimum sentence under 21 U.S.C. § 841(b)(1)(B) should also be rejected. The government agrees with Probation's response to this objection by Beatty. See PSR at 42. As acknowledged by Beatty, himself, the First Circuit has resolved this issue in United States v. Lopez-Gil, 965 F.2d 1124 (1st Cir. 1992), which held that the term "cocaine base" in 21 U.S.C. § 841 extends to all forms of cocaine base, whether "crack" or some other form of cocaine base. See  Lopez-Gil, 965 F.2d at 1134; see also United States v. Richardson,

225 F.3d 46, 49-50 (1st Cir. 2000) (endorsing construction that § 841 extends to all types of cocaine base, whether "crack" or otherwise). The circuit split on this issue does not give Beatty any grounds for relief. Instead, until and unless the Supreme Court overturns the First Circuit's position on this issue (or the First Circuit reverses itself), Beatty remains subject to current First Circuit law on this issue – i.e., that the enhanced statutory penalties in § 841 concerning "cocaine base" – including the 10-year mandatory minimum set forth in § 841(b)(1) – apply to all forms of cocaine base.

Moreover, even if any such change in the law were to take place, Beatty's challenge to the 10-year mandatory minimum fails on the facts. As detailed above, the record clearly and unequivocally establishes that Beatty distributed "crack cocaine" in this case.

### 4.    Objection # 12  (Request for Departure under USSG § 4A1.3)

The Court should also reject Beatty's claim that he is entitled to a downward departure under USSG § 4A1.3 because his "career offender status grossly overstates the seriousness of Mr. Beatty's criminal record and the risks of recidivism." For the following reasons, a downward departure under § 4A1.3 is inappropriate here.

First, according to the specific terms of § 4A1.3(b)(1), a departure may only be warranted where "reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that [he] will commit other crimes." USSG § 4A1.3(b)(1). The Application Notes explain that such a departure "may be warranted if, for example, the defendant had two minor misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior criminal behavior in the intervening period." Id., Applic. Note 3 (emphasis added). Beatty's history paints a much different picture:

- After maintaining a clean criminal record throughout his young adult life, upon turning 33 years old, Beatty began a life of continuous criminal activity. Specifically, at 33

14

years old (on 9/27/91), Beatty was found guilty of conspiracy to violate the Controlled Substances Act by trafficking cocaine by the Worcester Superior Court, which sentenced him to 5-years imprisonment, with 30 days to serve and the balance (4 years and 11 months) suspended while he served 2 years on probation. PSR at ¶ 90;

•      In August 1992, Defendant was convicted of being a disorderly person. PSR at ¶ 91;

•      In August 1994, while still under the foregoing suspended sentence, Beatty was convicted of trafficking cocaine and conspiracy to violate the Controlled Substances Act by distributing cocaine, despite the fact that a 4-year, 11-month sentence of imprisonment was "hanging over his head." The court did, in fact, revoke his probation and sentenced Beatty to serve the remainder of his suspended sentence. PSR at ¶ 92.

•      Even the foregoing sentences did not deter Beatty from returning to a life of trafficking drugs. On May 9, 2005, he was arrested by the MET Team on the instant federal drug charges.

Clearly, Beatty's criminal history is significantly more egregious than the example in Application Note 3, illustrating the type of defendant who may warrant a downward departure under § 4A1.1. Instead, Beatty earned each of the 8 criminal history points attributed to him by Probation. In addition, Beatty continued to engage in illegal drug activity even while he was still under a probationary sentence from a previous conviction. Any suggestion that his criminal history category overstates the risk of recidivism here simply must fail.

C.     **The Sentencing Factors Set Forth in 18 U.S.C. § 3353(a)**
       **Support a Sentence of Imprisonment with the Guidelines**

In addition to all of the reasons set forth above, this Court should impose a Guidelines sentence because such a sentence is warranted under 18 U.S.C. § 3553(a). Specifically, a sentence within the GSR is supported by §§ 3553(a)(1), 3553(a)(2), 3553(a)(4), and 3553(a)(6). See generally 18 U.S.C. § 3553(a). The government reserves its right to supplement this argument at the sentencing hearing in this matter.

15

### III.    CONCLUSION

For all of the foregoing reasons, the United States respectfully submits that a sentence of 140 months is both proper and just in this matter.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:    _/s/ Lisa M. Asiaf_____

Date: Sept. 26, 2006          LISA M. ASIAF
Assistant U.S. Attorney
Tel:  (617) 748-3268

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on Sept. 26, 2006.

_/s/ Lisa M. Asiaf_____
LISA M. ASIAF
Assistant U.S. Attorney

# EXHIBIT 1

## AFFIDAVIT OF BRIAN J. HALL

I, Brian J. Hall, being duly sworn, do depose and state that:

1.      I am a Forensic Chemist with the Drug Enforcement Administration's Northeast Laboratory in New York. I have been employed as a Forensic Chemist for six (6) years and as a Forensic Toxicologist for twelve (12) years prior to joining the Drug Enforcement Administration ("DEA") in 2000. Some of my duties as a Forensic Chemist include analyzing substances brought to our lab for the presence of a controlled substance and testifying as to the analysis in court. I have a Associate of Science ("A.S.") degree in biology from Nassau Community College, a Bachelor of Science ("B.S.") degree in toxicology from St. John's University, and a Master of Science ("M.S.") degree in toxicology from St. John's University. I have also received specialized training from the DEA in the area of forensic analysis of controlled substances and continually receive ongoing training in the area of forensic analysis of controlled substances. Additionally, I have taught courses and classes in the following subject matters: field testing and pharmacology. A copy of my curriculum vitae is attached hereto as **Exhibit 1(A)** and is incorporated herein by reference.

2.      Over the course of my career, I have conducted thousands of forensic chemical analyses. I have identified many controlled substances, including cocaine, cocaine base (commonly known by its street name as "crack"), heroin, marijuana and methamphetamine. I am a member of the Clandestine Laboratory Investigating Chemists and have testified as an expert in the forensic analysis of controlled substances over a dozen times, in federal and state courts in New York, Pennsylvania, New Jersey, Connecticut and Rhode Island.

3.      Through my training and over the course of my career, I have identified cocaine base on hundreds of occasions. I have receiving training at the DEA laboratory regarding the

conversion process of converting powder cocaine into crack cocaine, including witnessing the conversion process myself. I am familiar through my training and experience with the chemical makeup of cocaine base (crack), the appearance of crack cocaine, and the manufacturing methods of crack cocaine.

4.      I know that powder cocaine is a white powdery substance that is usually produced outside the United States by combining coca leaves or coca paste and hydrochloric acid. The cocaine is then imported and commonly ingested by snorting. This substance is identified as cocaine hydrochloride due to the presence of the hydrochloride ion.

5.      I also know that cocaine base is a smokeable form of cocaine which has been reduced through a manufacturing process to the base form. The most common method of converting powder cocaine into cocaine base is by combining powder cocaine with water and a base, such as sodium bicarbonate (a/k/a baking soda), boiling the water, and then drying the solid mass which results when the water is cooled. The cocaine base is then broken into rock-like or chunky pieces and commonly smoked by drug users. This method produces cocaine base known by its more familiar street term, crack cocaine. The substance can usually be recognized because of its chunky rock-like appearance.

6.      Crack cocaine and cocaine base are identical at the molecular level. While the presence of sodium bicarbonate may be an indicator that the crack cocaine was produced in the manner described above, evidence of sodium bicarbonate is often not found in crack cocaine because it dissipates through the manufacturing process. There is no reliable chemical test that will distinguish crack from certain other forms of cocaine base -- they are chemically identical.

7.      I have personally viewed the substances submitted in the case relating to a defendant named Leo Beatty. More specifically, I have examined  Exhibit 86 (Lab No. 170439),

Exhibit 93 (Lab No. 170554), Exhibit 99 (Lab No. 170775), Exhibit 108 (Lab No. 171552),

Exhibit 128 (Lab No. 172779), and Exhibit 130 (Lab No. 173315). As noted in each of the lab

reports attached hereto as **Exhibit 1(B)** through **Exhibit 1(G)**, these items were all off-white and

chunky rock-like in appearance, which in my training and experience is consistent with the color,

texture and appearance of cocaine base in the form of crack cocaine.

       8.      I am the Forensic Chemist who analyzed each of the exhibits listed above.

During the testing process, each of the exhibits is ground in a mortar and pestle in order to

perform a forensic analysis of a homogeneous sample. True and accurate copies of my lab

reports for of Exhibits 86, 93, 99,108, 128, and 130 are attached hereto as follows:

         **Exhibit 1(B)** – Exhibit 86 (Lab No. 170439), cocaine base, net weight of 4.8

grams

         **Exhibit 1(C)** – Exhibit 93 (Lab No. 170554), cocaine base, net weight of 7.1

grams

         **Exhibit 1(D)** – Exhibit 99 (Lab No. 170775), cocaine base, net weight of 19.9

grams

         **Exhibit 1(E)** – Exhibit 108 (Lab No. 171552), cocaine base, net weight of 19.0

grams

         **Exhibit 1(F)** – Exhibit 128 (Lab No. 172779), cocaine base, net weight of 24.2

grams

         **Exhibit 1(G)** – Exhibit 130 (Lab No. 173315), cocaine base, net weight of 11.3

grams

       9.      Based on my training and experience, my viewing of Exhibits 86, 93, 99,108, 128,

and 130, which appeared in a color and texture consistent with crack cocaine, and my testing of

these exhibits, which established that the substances are cocaine base, my opinion to a reasonable

degree of scientific certainty is that Exhibits 86, 93, 99, 108, 128, and 130 are all cocaine base

in the form of crack cocaine.

**SWORN UNDER THE PAINS AND PENALTIES OF PERJURY THIS 25ᵗʰ DAY OF SEPTEMBER, 2006:**

Brian J. Hall
Forensic Chemist, Drug Enforcement Administration
Northeast Regional Laboratory

CINDY VITALE
Notary Public, State of New York
No. 01NO5025917
Qualified in Queens County
Commission Expires April 4, 20 10

# EXHIBIT 1(A)

# Curriculum Vitae

Brian J. Hall
Forensic Chemist
Drug Enforcement Administration
7/2006

## Experience:

| | |
|---|---|
| 2/2000 to present | Drug Enforcement Administration<br>Northeast Laboratory, New York<br>Position: Forensic Chemist |
| 9/1999 to 2/2000 | Ammon Analytical Laboratory<br>Hillside , New Jersey<br>Position: Toxicology Supervisor |
| 10/1993 to 4/1999 | Laboratory Corporation of America<br>Uniondale, New York<br>Position: Clinical/Forensic Toxicologist |
| 6/1988 to 10/1993 | NDA Laboratory<br>Farmingdale, New York<br>Position: Clinical/Forensic Toxicologist |

## Education:

| | |
|---|---|
| 9/1988 to 5/1992 | St. John's University<br>Jamaica, New York<br>Degree: Master of Science (Toxicology) |
| 9/1986 to 5/1988 | St. John's University<br>Jamaica, New York<br>Degree: Bachelor of Science (Toxicology)<br>Minor: Chemistry |
| 9/1982 to 5/1986 | Nassau Community College<br>Garden City, New York<br>Degree: Associate of Science (Biology) |

**Training:**

| | |
|---|---|
| 2000 | Basic Forensic Chemist Training (Technical)<br>Drug Enforcement Administration, Northeast Laboratory, New York |
| 2001 | Clandestine Laboratory Safety Training<br>Drug Enforcement Administration, Quantico, Virginia |
| 2001 | GC/MS Maintenance<br>Agilent Technologies, Alphretta, Georgia |
| 2002 | Basic Forensic Chemist Training (Administrative)<br>Drug Enforcement Administration, Quantico, Virginia |
| 2002 | Interpretation of Mass Spectra<br>Agilent Technologies, Paramus, New Jersey |
| 2003 | Hazardous Material Incident Response Operations<br>Environmental Protection Agency, Edison, New Jersey |
| 2005 | Advanced Applications of LC/MS<br>Agilent Technologies, Durham, North Carolina |

**Court Testimony:**

Binghamton, New York (Federal)

York, Pennsylvania (State)

Albany, New York (State)

Newark, New Jersey (Federal)

New York, New York    Southern District (Federal)

New York, New York    Eastern District (Federal)

Philadelphia, Pennsylvania (Federal)

Hartford Connecticut (Federal)

Providence, Rhode Island (Federal)

# EXHIBIT 1(B)

U.S. Department of Justice
Drug Enforcement Administration

**REPORT OF DRUG PROPERTY COLLECTED, PURCHASED OR SEIZED**

| HOW OBTAINED (Check) | 2a. FILE NO. | 2b. PROGRAM CODE | 3. G-DEP ID |
|---|---|---|---|
| [X] Purchase ☐ Seizure ☐ Free Sample | | | |
| ☐ Lab. Seizure ☐ Money Flashed ☐ Compliance Sample (Non-Criminal) | | | |
| ☐ Internal Body Carry ☐ Other (Specify) | | | |

| 4. WHERE OBTAINED (City, State/Country) | 4b. DATE OBTAINED | 5. FILE TITLE |
|---|---|---|
| Fitchburg, MA/USA | 02-10-2005 | A |

| a. REFERRING AGENCY (Name) | 6b. REFERRAL | 7. DATE PREPARED | 8. GROUP NO. |
|---|---|---|---|
| | ☐ Case No. OR ☐ Seizure No. No. | 02-10-2005 | MET / 2 |

| Exhibit No. | 10. FDIN (10 characters) | 11. ALLEGED DRUGS | 12. MARKS OR LABELS (Describe fully) | APPROX. GROSS QUANTITY | | 15. Purchase Cost |
|---|---|---|---|---|---|---|
| | | | | 13. Seized | 14. Submitted | |
| 6 | | Cocaine Base | One (1) clear, plastic bag | 31.00 ggw | 31.00 ggw | $500.00 |
| | | | containing an off-white, | | | |
| | | | rock-like substance. Ex- | | | |
| | | | hibit is marked "ELS""02- | | | |
| | | | 10-2005" "FT+" for field testing. | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

16. WAS ORIGINAL CONTAINER SUBMITTED SEPARATE FROM DRUG ? [X] NO (included above)   ☐ YES (if Yes, enter exhibit no. and describe original container fully)

REMARKS:

Exhibit #86 was acquired by U/C S/A Story from BEATTY, Leo for $500.00 OAF/USC on 02-10-2005
in Fitchburg, MA. S/A Story maintained care and custody of said exhibit until transferring
said exhibit to S/A Sarabia who processed, weighed, and field tested (with positive results)
said exhibit. S/A Sarabia then transported said exhibit to NEFD. Once there, S/A Sarabia
secured said exhibit in the NEFD/DEC Vault for safekeeping. On a later date, S/A Sarabia
removed said exhibit from the NEFD/DEC Vault and mailed said exhibit to NERL via RMRRRR for
further analysis and safekeeping.

| 17. SUBMITTED BY SPECIAL AGENT (Signature) | 18. APPROVED BY (Signature & Title) |
|---|---|
| S/A Edgar L. Sarabia | G/S Richard W. Godward, Jr. |

**LABORATORY EVIDENCE RECEIPT REPORT**

| 19. NO. PACKAGES | 20. RECEIVED FROM (Signature & Date) | 21. Print or Type NAME and TITLE |
|---|---|---|
| 1 | DB 72+095-805 | |
| 22. SEAL | 23. RECEIVED BY (Signature & Date) | 24. Print or Type NAME and TITLE |
| ☐ Broken [X] Unbroken | 3/22/05 | Irene Mila EC |
| MR 3/4/05 | | |

**LABORATORY REPORT**

25. ANALYSIS SUMMARY AND REMARKS

**Exhibit #86 contains cocaine base.**

Gross Wt. = 30.0 g

Net Wt. = 4.8 g

SEE CERTIFICATION ON BACK

| 26. Exhibit No. | 27. Lab. No. | 28. ACTIVE DRUG INGREDIENT (Established or Common Name) | CONCENTRATION | | | 32. AMT. OF PURE DRUG | 33. RESERVE |
|---|---|---|---|---|---|---|---|
| | | | 29. Strength | 30. Measure | 31. Unit | | |
| 86 | 170439 | cocaine base | 88 | % | | 4.2 g | 4.5 g |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| 34. ANALYST (Signature) | 35. TITLE | 36. DATE COMPLETED |
|---|---|---|
| BRIAN J. HALL | FORENSIC CHEMIST | 3/2/05 |
| 37. APPROVED BY (Signature & Date) | 38. TITLE | 39. LAB. LOCATION |
| THOMAS M. BLACKWELL 3/7/05 | LABORATORY DIRECTOR | NEW YORK |

# EXHIBIT 1(C)

**U.S. Department of Justice**
Drug Enforcement Administration

**REPORT OF DRUG PROPERTY COLLECTED, PURCHASED OR SEIZED**

| 1. HOW OBTAINED (Check) | | | |
|---|---|---|---|
| ☐ Lab. Seizure | [X] Purchase | ☐ Seizure | ☐ Free Sample |
| ☐ Internal Body Carry | ☐ Money Flashed | ☐ Compliance Sample (Non-Criminal) | |
| | ☐ Other (Specify) | | |

| 2a. FILE NO. | 2b. PROGRAM CODE | 3. G-DEP ID |
|---|---|---|
| | | |

| 4a. WHERE OBTAINED (City, State/Country) | 4b. DATE OBTAINED | 5. FILE TITLE |
|---|---|---|
| Fitchburg, MA/USA | 02-17-2005 | |

| 6a. REFERRING AGENCY (Name) | 6b. REFERRAL | | 7. DATE PREPARED | 8. GROUP NO. |
|---|---|---|---|---|
| | ☐ Case No. OR ☐ Seizure No. No. | | 02-22-2005 | MET / 2 |

| 9. Exhibit No. | 10. FDIN (10 characters) | 11. ALLEGED DRUGS | 12. MARKS OR LABELS (Describe fully) | APPROX. GROSS QUANTITY | | 15. Purchase Cost |
|---|---|---|---|---|---|---|
| | | | | 13. Seized | 14. Submitted | |
| 93 | | Cocaine Base | One(1)clear, plastic baggie containing an off-white, rock-like substance. Plast-ic bag is further contained inside a white-colored pap-er napkin.Exhibit is marked "FT+""ELS""02-22-05" for field testing. Baggie is twist-tied at the top. | 35.32 ggw | 35.32 ggw | $800.00 |

**16. WAS ORIGINAL CONTAINER SUBMITTED SEPARATE FROM DRUG ?** [X] NO (included above)   ☐ YES (if Yes, enter exhibit no. and describe original container fully)

REMARKS:

On 02/22/2005, Exhibit #93 was purchased by S/A Story from Leo BEATTY for $800.00 OAF/USC in Fitchburg,MA. S/A Story maintained care and custody of exhibit, and sealing it, and then turning it over to TFO Connoly who then stored it at the FPD for safekeeping. On 02/22/05, TFO Connoly removed said ex. and transferred it to S/A Sarabia who then field tested said exhibit with positive results, processed and weighed it. S/A Sarabia then transported exhibit to NEFD. Once there, S/A Sarabia submitted it to the NEFD/DEC Vault for safekeeping. On a later date, S/A Sarabia mailed the ex.to NERL via RMRRR for further analysis and safekeeping.

| 17. SUBMITTED BY SPECIAL AGENT (Signature) | 18. APPROVED BY (Signature & Title) |
|---|---|
| S/A Edgar L. Sarabia | G/S Richard W. Goddard, Jr |

**LABORATORY EVIDENCE RECEIPT REPORT**

| 19. NO. PACKAGES | 20. RECEIVED FROM (Signature & Date) | 21. Print or Type NAME and TITLE |
|---|---|---|
| | | |
| 22. SEAL ☐ Broken [X] Unbroken | 23. RECEIVED BY (Signature & Date) | 24. Print or Type NAME and TITLE |

**LABORATORY REPORT**

25. ANALYSIS SUMMARY AND REMARKS

Exhibit #93 contains cocaine base.

Gross Wt. = 33.8 g

Net Wt. = 7.1 g

**SEE CERTIFICATION ON BACK**

| 26. Exhibit No. | 27. Lab. No. | 28. ACTIVE DRUG INGREDIENT (Established or Common Name) | CONCENTRATION | | | 32. AMT. OF PURE DRUG | 33. RESERVE |
|---|---|---|---|---|---|---|---|
| | | | 29. Strength | 30. Measure | 31. Unit | | |
| 93 | 170354 | cocaine base | 88 | % | | 6.2 g | 6.2 g |
| | | | | | | | |
| | | | | | | | |

| 34. ANALYST (Signature) | 35. TITLE | 36. DATE COMPLETED |
|---|---|---|
| BRIAN J. HALL | FORENSIC CHEMIST | 3/13/05 |
| 37. APPROVED BY (Signature) | 38. TITLE | 39. LAB. LOCATION |
| THOMAS M. | LABORATORY DIRECTOR | NEW YORK |

34

# EXHIBIT 1(D)

**U.S. Department of Justice**
Drug Enforcement Administration

**REPORT OF DRUG PROPERTY COLLECTED, PURCHASED OR SEIZED**

| 1. HOW OBTAINED (Check) | | | 2a. FILE NO. | 2b. PROGRAM CODE | 3. G-DEP ID |
|---|---|---|---|---|---|
| [X] Purchase   [ ] Seizure   [ ] Free Sample | | | | | |
| [ ] Lab. Seizure   [X] Money Flashed   [ ] Compliance Sample (Non-Criminal) | | | | | |
| [ ] Internal Body Carry   [ ] Other (Specify) | | | | | |

| 4a. WHERE OBTAINED (City, State/Country) | 4b. DATE OBTAINED | 5. FILE TITLE |
|---|---|---|
| Fitchburg, MA | 03-03-2005 | |

| 6a. REFERRING AGENCY (Name) | 6b. REFERRAL | 7. DATE PREPARED | 8. GROUP NO. |
|---|---|---|---|
| | [ ] Case No. OR [ ] Seizure No.    No. | 03-07-2005 | MET / Group 2 |

| 9. Exhibit No. | 10. FDIN (10 characters) | 11. ALLEGED DRUGS | 12. MARKS OR LABELS (Describe fully) | APPROX. GROSS QUANTITY 13. Seized | 14. Submitted | 15. Purchase Cost |
|---|---|---|---|---|---|---|
| 99 | | Cocaine Base | One (1) clear, plastic, | 45.56 ggw | 45.56 ggw | $1,500.00 |
| | | | bag containing an off-white | | | |
| | | | rock-like substance. | | | |
| | | | Exhibit bears the initials | | | |
| | | | "ELS", the date "03-03-05" | | | |
| | | | and "FT+" for field testing. | | | |
| | | | Exhibit also bears the initials | | | |
| | | | "SCS" | | | |

16. WAS ORIGINAL CONTAINER SUBMITTED SEPARATE FROM DRUG ? [X] NO (included above)   [ ] YES (if Yes, enter exhibit no. and describe original container fully)

REMARKS:
On 03-03-2005, U/C S/A Story purchased Exhibit #99 from Leo BEATTY for $1,500.00 OAF/USC in Fitchburg, MA. S/A Story maintained care/custody of said exhibit until transferring said exhibit to S/A Sarabia on the same day. S/A Sarabia then processed, weighed, and field tested (w/ positive results) said exhibit. S/A Story then initialed said exhibit. On 03-03-2005, S/A Sarabia transported said exhibit to the NEFD/DEC. Once there, S/A Sarabia submitted said exhibit to the NEFD/DEC for safekeeping. On a later date, S/A Sarabia removed said exhibit from the DEC and mailed it to NERL via RMRRR for further analysis and safekeeping.

| 17. SUBMITTED BY SPECIAL AGENT (Signature) | 18. APPROVED BY (Signature & Title) |
|---|---|
| S/A Edgar L. Sarabia | G/S Richard W. Guerard, Jr. |

**LABORATORY EVIDENCE RECEIPT REPORT**

| 19. NO. PACKAGES | 20. RECEIVED FROM (Signature & Date) | 21. Print or Type NAME and TITLE |
|---|---|---|
| | | |

| 22. SEAL | 23. RECEIVED BY (Signature & Date) | 24. Print or Type NAME and TITLE |
|---|---|---|
| [ ] Broken [X] Unbroken | 3/21/05 | |

**LABORATORY REPORT**

25. ANALYSIS SUMMARY AND REMARKS:

Exhibit #99 contains cocaine base.

Gross Wt.  =  43.8 g

Net Wt.    =  19.9 g

**SEE CERTIFICATION ON BACK**

| 26. Exhibit No. | 27. Lab. No. | 28. ACTIVE DRUG INGREDIENT (Established or Common Name) | CONCENTRATION 29. Strength | 30. Measure | 31. Unit | 32. AMT. OF PURE DRUG | 33. RESERVE |
|---|---|---|---|---|---|---|---|
| 99 | 170775 | cocaine base | 82 | % | | 16.3 g | 14.7 g |

| 34. ANALYST (Signature) | 35. TITLE | 36. DATE COMPLETED |
|---|---|---|
| BRIAN J. HALL | FORENSIC CHEMIST | 3/17/05 |

| 37. APPROVED BY (Signature & Date) | 38. TITLE | 39. LAB. LOCATION |
|---|---|---|
| THOMAS M. BLACKWELL | LABORATORY DIRECTOR | NEW YORK |

# EXHIBIT 1(E)

**U.S. Department of Justice**
Drug Enforcement Administration

**REPORT OF DRUG PROPERTY COLLECTED, PURCHASED OR SEIZED**

| 1. HOW OBTAINED (Check) | | | | 2a. FILE NO. | 2b. PROGRAM CODE | 3. G-DEP ID |
|---|---|---|---|---|---|---|
| [X] Purchase  [ ] Seizure  [ ] Free Sample | | | | | | |
| [ ] Lab. Seizure  [ ] Money Flashed  [ ] Compliance Sample (Non-Criminal) | | | | | | |
| [ ] Internal Body Carry  [ ] Other (Specify) | | | | | | |

| 4a. WHERE OBTAINED (City, State/Country) | 4b. DATE OBTAINED | 5. FILE TITLE |
|---|---|---|
| Fitchburg, MA/USA     128C | 03-17-2005 | |

| 5a. REFERRING AGENCY (Name) | 6b. REFERRAL | 7. DATE PREPARED | 8. GROUP NO. |
|---|---|---|---|
| | [ ] Case No. OR [ ] Seizure No.  No. | 03-30-2005 | MET / 2 |

| 9. Exhibit No. | 10. FDIN (10 characters) | 11. ALLEGED DRUGS | 12. MARKS OR LABELS (Describe fully) | APPROX. GROSS QUANTITY | | 15. Purchase Cost |
|---|---|---|---|---|---|---|
| | | | | 13. Seized | 14. Submitted | |
| 108 | | Cocaine Base | One(1) clear, plastic baggie | 42.68 ggw | 42.68 ggw | $1,500.00 |
| | | | containing an off-white, | | | |
| | | | rock-like substance. Plast- | | | |
| | | | ic bag is further twist-tied | | | |
| | | | at the top. | | | |

16. WAS ORIGINAL CONTAINER SUBMITTED SEPARATE FROM DRUG ? [X] NO (included above)  [ ] YES (if Yes, enter exhibit no. and describe original container fully)

REMARKS:

On 03/17/2005, Exhibit #108 was purchased by S/A Story from Leo BEATTY for $1,500.00 OAF/USC in Fitchburg, MA. S/A Story maintained care and custody of exhibit, weighing, processing, and sealing it. S/A Story then turned it over to TFO Deming who then secured it at the LPD for safekeeping. On 03/30/05, TFO Deming removed said ex. and transferred it to S/A Sarabia who then weighed it. On the same day, S/A Sarabia transported exhibit to NEFD. Once there, S/A Sarabia submitted it to the NEFD/DEC Vault for safekeeping. On a later date, S/A Sarabia mailed the ex. to NERL via RMRRR for further analysis and safekeeping.

| 17. SUBMITTED BY SPECIAL AGENT (Signature) | 18. APPROVED BY (Signature & Title) |
|---|---|
| S/A Edgar L. Sarabia | G/S Richard W. Gerard, Jr. |

**LABORATORY EVIDENCE RECEIPT REPORT**

| 19. NO. PACKAGES | 20. RECEIVED FROM (Signature & Date) RB 727096151US | 21. Print or Type NAME and TITLE |
|---|---|---|
| 22. SEAL [ ] Broken [ ] Unbroken | 23. RECEIVED BY (Signature & Date) Dawn Michael 4/6/05 | 24. Print or Type NAME and TITLE Dawn Michael Senior ET |
| MR  4/21/05 | | |

**LABORATORY REPORT**

25. ANALYSIS SUMMARY AND REMARKS

**Exhibit #108 contains cocaine base.**

Gross Wt.  = 43.0 g

Net Wt.    = 19.0 g

**SEE CERTIFICATION ON BACK**

| 26. Exhibit No. | 27. Lab. No. | 28. ACTIVE DRUG INGREDIENT (Established or Common Name) | CONCENTRATION | | | 32. AMT. OF PURE DRUG | 33. RESERVE |
|---|---|---|---|---|---|---|---|
| | | | 29. Strength | 30. Measure | 31. Unit | | |
| 108 | 171552 | cocaine base | 87 | % | | 16.5 g | 18.7 g |

| 34. ANALYST (Signature) BRIAN J. HALL | 35. TITLE FORENSIC CHEMIST | 36. DATE COMPLETED 4/20/05 |
|---|---|---|
| 37. APPROVED BY (Signature & Date) THOMAS M. BREEN  4/21/05 | 38. TITLE LABORATORY DIRECTOR | 39. LAB. LOCATION NEW YORK     40 |

DEA Form - 7
(Sept. 1995)

Previous edition dated 4/90 may be used until stock is exhausted.

1 - Prosecution

# EXHIBIT 1(F)

U.S. Department of Justice
Drug Enforcement Administration

**REPORT OF DRUG PROPERTY COLLECTED, PURCHASED OR SEIZED**

| 1. HOW OBTAINED (Check) | | 2a. FILE NO. | 2b. PROGRAM CODE | 3. G-DEP ID |
|---|---|---|---|---|

HOW OBTAINED (Check): ☐ Purchase ☒ Seizure ☐ Free Sample
☐ Lab. Seizure ☒ Money Flashed ☐ Compliance Sample (Non-Criminal)
☐ Internal Body Carry ☐ Other (Specify)

| 4a. WHERE OBTAINED (City, State/Country) | 4b. DATE OBTAINED | 5. FILE TITLE |
|---|---|---|
| Lunenburg, MA/USA | 05-09-2005 | |

| 6a. REFERRING AGENCY (Name) | 6b. REFERRAL | 7. DATE PREPARED | 8. GROUP NO. |
|---|---|---|---|
| | ☐ Case No. OR ☐ Seizure No. No. | 05-11-2005 | MET / 2 |

| Exhibit No. | 10. FDIN (10 characters) | 11. ALLEGED DRUGS | 12. MARKS OR LABELS (Describe fully) | APPROX. GROSS QUANTITY 13. Seized | 14. Submitted | 15. Purchase Cost |
|---|---|---|---|---|---|---|
| 8 | | Cocaine Base | One (1) sandwich-type plastic baggie, twist-tied at the top, containing an off-white, rock-like substance. Exhibit it marked "ELS""FT+" the date for field testing, and "SCS". | 49.89 ggw | 49.89 ggw | N/A |

WAS ORIGINAL CONTAINER SUBMITTED SEPARATE FROM DRUG? ☒ NO (included above) ☐ YES (If Yes, enter exhibit no. and describe original container fully)

**16. REMARKS:**
.#128 was seized by S/A Steven C. Story from Leo BEATTY on 05-09-2005 in Lunenburg, MA.
S/A Story maintained care and custody of said exhibit until handing said exhibit over to S/A
Sarabia on the same date. S/A Sarabia then field tested (with positive results), weighed, and
processed Exhibit #128 and then transported said exhibit to the NEFD. Once there, S/A Sarabia
secured said exhibit in the NEFD/DEC for safekeeping. On a later date, S/A Sarabia removed
said exhibit from the NEFD/DEC and mailed said exhibit to NEFL via RMRRR for further analysis
and safekeeping.

| 17. SUBMITTED BY SPECIAL AGENT (Signature & Title) | 18. APPROVED BY (Signature & Title) |
|---|---|
| Edgar L. Sarabia | G/S Richard W. Guerard, Jr. |

**LABORATORY EVIDENCE RECEIPT REPORT**

| 19. PACKAGES | 20. RECEIVED FROM (Signature & Date) | 21. Print or Type NAME and TITLE |
|---|---|---|
| 22. SEAL ☐ Unbroken | 23. RECEIVED BY (Signature & Date) | 24. Print or Type NAME and TITLE |
| 25. 06/13/05 | | |

**LABORATORY REPORT**

**26. ANALYSIS SUMMARY AND REMARKS**
Exhibit #128 contains cocaine base.

Gross Wt. = 48.8 g

Net Wt. = 24.2 g

SEE CERTIFICATION ON BACK

| Exhibit No. | 27. Lab. No. | 28. ACTIVE DRUG INGREDIENT (Established or Common Name) | 29. Strength | 30. Measure | 31. Unit | 32. AMT. OF PURE DRUG | 33. RESERVE |
|---|---|---|---|---|---|---|---|
| 28 | 172779 | cocaine base | 83 | % | | 20.0 g | 23.7 g |

| 34. ANALYST (Signature) | 35. TITLE | 36. DATE COMPLETED |
|---|---|---|
| W. J. Hall | FORENSIC CHEMIST | 06/08/2005 |
| 37. APPROVED BY (Signature & Date) | 38. TITLE | 39. LAB. LOCATION |
| Thomas M. H. | LABORATORY DIRECTOR | NEW YORK |

Form DEA-7 (July 1995) Previous edition dated 4/90 may be used until stock is exhausted. 2 - Org. Office

123

# EXHIBIT 1(G)

**Department of Justice**
**Drug Enforcement Administration**

**REPORT OF DRUG PROPERTY COLLECTED, PURCHASED OR SEIZED**

| 1. HOW OBTAINED (Check) | | | 2a. FILE NO. | 2b. PROGRAM CODE | 3. G-DEP ID |
|---|---|---|---|---|---|
| ☐ Purchase  ☒ Seizure  ☐ Free Sample | | | | | |
| ☐ Lab. Seizure  ☐ Money Flashed  ☐ Compliance Sample (Non-Criminal) | | | | | |
| ☐ Internal Body Carry  ☐ Other (Specify) | | | | | |

| 4a. WHERE OBTAINED (City, State/Country) | 4b. DATE OBTAINED | 5. FILE TITLE |
|---|---|---|
| Leominster, MA | 05-10-2005 | |

| 6. REFERRING AGENCY (Name) | 6b. REFERRAL | 7. DATE PREPARED | 8. GROUP NO. |
|---|---|---|---|
| | ☐ Case No. OR ☐ Seizure No. No. | 06-13-2005 | MET / 2 |

| Exhibit No. | 10. FDIN (10 characters) | 11. ALLEGED DRUGS | 12. MARKS OR LABELS (Describe fully) | APPROX. GROSS QUANTITY | | 15. Purchase Cost |
|---|---|---|---|---|---|---|
| | | | | 13. Seized | 14. Submitted | |
| 30 | | Cocaine Base | One (1) sandwich-type plast | 35.38 ggw | 35.38 ggw | N/A |
| | | | ic baggie, twist-tied at | | | |
| | | | the top, containing an off- | | | |
| | | | white, rock-like substance. | | | |
| | | | Exhibit it marked "ELS""FT+  " | | | |
| | | | the date for field testing. | | | |
| | | | Originally secured in an LP D evidence bag. | | | |

***** FINGERPRINT ANALYSIS REQUESTED****** FINGERPRINT ANALYSIS REQUESTED******

WAS ORIGINAL CONTAINER SUBMITTED SEPARATE FROM DRUG ? ☒ NO (included above)  ☐ YES (if Yes, enter exhibit no. and describe original container fully)

MARKS:

..#128 was seized by TFA J. Siciliano on 05-10-05 and found in the ceiling area just outside
18 Musket Dr., Bldg.3, Apt. 2A. TFA Siciliano maintained care/custody of ex. securing it at
D until tranferring said ex. to S/A Sarabia on 06-07-05. S/A Sarabia then field tested (with
sitive results), weighed, and processed Exhibit #128 and then transported said exhibit to
E NEFD. Once there, S/A Sarabia secured said exhibit in the NEFD/DEC for safekeeping. On a
ter date, S/A Sarabia removed said exhibit from the NEFD/DEC and mailed said exhibit to NERL
a RMRRR for further analysis and safekeeping. **FINGERPRINT ANALYSIS REQUESTED**

| 16. SUBMITTED BY SPECIAL AGENT (Signature) | 18. APPROVED BY (Signature & Title) |
|---|---|
| Edgar L. Sarabia | G/S Richard W. Greene, Jr. |

### LABORATORY EVIDENCE RECEIPT REPORT

| 19. NO. PACKAGES | 20. RECEIVED FROM (Signature & Date) | 21. Print or Type NAME and TITLE |
|---|---|---|
| 1 | JE 13-12-09685Y | |
| 22. SEAL ☐ Broken ☐ Unbroken | 23. RECEIVED BY (Signature & Date) 6/15/05 | 24. Print or Type NAME and TITLE  Irene Milo |

### LABORATORY REPORT

6/27/05

ANALYSIS SUMMARY AND REMARKS

**Exhibit #130 contains cocaine base.**

**Gross Wt. = 45.6 g**

**Net Wt. = 11.3 g**

**\*original packaging removed for fingerprint analysis.\***

## SEE CERTIFICATION ON BACK

| Exhibit No | 27. Lab. No. | 28. ACTIVE DRUG INGREDIENT (Established or Common Name) | CONCENTRATION | | | 32. AMT. OF PURE DRUG | 33. RESERVE |
|---|---|---|---|---|---|---|---|
| | | | 29. Strength | 30. Measure | 31. Unit | | |
| 130 | 173315 | cocaine base | 86 | % | | 9.7 g | 11.0 g |

| 34. ANALYST (Signature) | 35. TITLE | 36. DATE COMPLETED |
|---|---|---|
| BRIAN J. HALL | FORENSIC CHEMIST | 6/23/05 |

| 37. APPROVED BY (Signature) | 38. TITLE | 39. LAB. LOCATION |
|---|---|---|
| THOMAS M. BLAC... 6/27/05 | LABORATORY DIRECTOR | NEW YORK |

Form DEA - 7
L 1995

Previous edition dated 4/90 may be used until stock is exhausted.

2 - Orig. Office

126

# EXHIBIT 2

## AFFIDAVIT OF STEVEN C. STORY

I, Steven C. Story, being duly sworn, depose and state as follows:

1.      I am a Special Agent with the Drug Enforcement Administration ("DEA"), United States Department of Justice. I have been so employed for almost 19 years, and I have been assigned to the DEA Mobile Enforcement Team in Boston, Massachusetts since June 2003. In connection with my duties and responsibilities as a DEA Special Agent, I have received specialized training in the field of narcotics investigations and enforcement. During the course of my employment with the DEA, I have conducted or assisted in over 400 federal and state drug investigations in the United States, and have become familiar with the inner workings and structure of large scale national and international drug trafficking conspiracies. I have previously participated in investigations relating to the distribution and sale of controlled substances such as cocaine, cocaine base ("crack cocaine"), marijuana, heroin, ecstasy ("MDMA") and methamphetamine. I have also participated in various aspects of investigatory work, including surveillance and undercover narcotics purchases, and have participated in the preparation and execution of narcotics-related arrest and search warrants.

2.      Among the 400+ drug investigations in which I have been involved, a substantial number of cases involved crack cocaine. I know through my training and experience that crack cocaine is a form of cocaine base that is made by heating powder cocaine in a liquid with a base, such as sodium bicarbonate (a/k/a baking soda) or other such agent, that reduces the powder cocaine to a chunky, rock-like form. Common street terms for this conversion process include "cooking" or "cheffing" the powder cocaine into crack cocaine. I also know that crack cocaine is usually ingested by smoking it through a glass tube or other device used as a "pipe."

1

3.       In late 2004 and early 2005, the MET Team was deployed in the area of

Fitchburg, MA, in Worcester County, to assist local law enforcement officials in investigating

illegal drug activity in the area. I know through my training and experience that during this time

period, crack cocaine on the streets of Fitchburg was commonly sold in the following amounts:

"twenty's" or "forty's," referring to $20 or $40 dollar rock pieces; "eight-balls," referring to an

1/8 of an ounce (or approximately 3.5 grams) of crack cocaine; a "half," referring to one half

ounce (or 14 grams) of crack cocaine; and a "Z" or "OZ," referring to one ounce (or 28 grams) of

crack cocaine. The terms mentioned here are just some of the street terms often used to refer to

amounts and identities of illegal drugs. The are a number of terms and codes often used by drug

dealers and drug buyers to refer to their drugs and drug deals. The terms can vary, but are

usually understood by the drug seller and buyer sufficiently to convey the terms of the drug deal.

4.       I am familiar with the DEA investigation of Leo Gordon Beatty and assisted with

various aspects of the investigation, including acting as the undercover agent (the "UC"), who

purchased the crack cocaine from Beatty during each transaction at issue in this case. This

investigation began in December 2004, when a confidential informant ("CI") informed DEA that

Beatty was selling crack cocaine. The CI introduced me to Beatty under the guise that I wanted

to purchase crack cocaine from Beatty.

5.       Exhibit 86:  With respect to the first transaction, which took place on February

10, 2005, I monitored telephone calls between the CI and Beatty in which the CI followed my

instructions to order 5 grams of crack cocaine from Beatty. The first call took place on February

3, 2005, when the CI called Beatty at telephone number (978) 235-0735, which was subscribed

to by Leo Beatty, 18 Musket Drive, Building 3, Apartment A2, Leominster, MA, during this time

frame. Beatty agreed to sell 5 grams of crack cocaine for $500, but the deal did not take place that day.

6.      The deal took place on February 10, 2005, when the CI and I met with Beatty at a prearranged location in Fitchburg, where Beatty sold me approximately 5 grams of crack cocaine (Exhibit 86) for $500. Beatty retrieved the package of crack cocaine from the glove compartment of a gray 2002 Jeep Cherokee bearing MA Registration 27DW02, which, according to the MA Registry of Motor Vehicles, was registered to Leo Gordon Beatty, 18 Musket Drive, Apartment 2A, Leominster, MA. Before giving the cash to Beatty (via the CI), I examined the substance that Beatty provided, which was chunky and rock-like in appearance and off-white in color. Based on my training and experience, the substance look like crack cocaine. In addition, after the transaction was complete, I asked Beatty if I could "get a better chunk for a better price," referring to a larger chunk of crack cocaine, during the next proposed transaction. Beatty replied to me, "we'll see."

7.      Exhibit 93: The next deal took place on February 17, 2005, when, at my direction and in my presence, the CI called Beatty and arranged a 10-gram purchase of crack cocaine. Shortly thereafter, the CI and I met with Beatty, who provided me (via the CI) a package containing a chunky rock-like substance, for which I gave Beatty $800. During this exchange, I commented that the package looked like it contained "a nice chunk . . . all in one piece." This exhibit (Exhibit 93) had a chunky, rock-like appearance and off-white color, and based on my training and experience, looked like crack cocaine. Consistent with this observation, Beatty explained to me that "whatever I lose in cooking it, you don't lose." Based on my training and experience, I understood Beatty to mean that he did not charge me for the difference between his

starting weight of cocaine powder and his ending weight of crack cocaine, despite the decrease in weight due to the conversion process.

8.      Exhibit 99:  The third deal took place on March 3, 2005.  At my direction and in my presence, the CI called Beatty to ask how much a "Z"(one ounce of crack cocaine) costs. While negotiating the weight and price for this deal, Beatty stated, "I can give him maybe twelve," referring to 12 grams of crack cocaine, for $1,000.  In explaining his prices, Beatty stated,"because what I pay for a 'Z' and then have to cook it, and the loss, you know what I mean, that's what kills me."  Based on my training and experience, I understood Beatty to mean that he had to structure his prices due to his cost of powder cocaine and the drug weight he lost in converting the powder cocaine into crack cocaine.

9.      Beatty ultimately sold me Exhibit 99 for $1500.  During the deal, I weighed the package that Beatty sold to me on a digital scale, which registered 21 grams.  Like the previous two transactions, the substance in Exhibit 99 was off-white and rock-like, and based on my training and experience, looked like crack cocaine.  Beatty then appeared to justify his high price of crack cocaine by explaining to me, "When you really think about it, what I gave you there is more than what somebody would get when they take an 'OZ' and cook it up sometime."  Based on my training and experience, I understood Beatty to mean that I was getting more with the 20 grams of crack that he sold to me than somebody who bought an ounce of powder cocaine and cooked it himself, due to the loss during the conversion process.  Beatty attested to me that Exhibit 99 is "good shit, you're not losing nothing – your's is right there."  Based on my training and experience, I understood Beatty to mean that I was not losing any weight because he had already converted the powder cocaine into crack cocaine for me.  Beatty then explained that I

4

would still profit from the re-sale of the crack cocaine, stating, "cause I know, cause I used to sell it in New Hampshire, with that right there [referring to Exhibit 99] you can make . . . up to a grand."

10.    Exhibit 108: The fourth, and last, transaction took place on March 17, 2005 when I directed the CI to call Beatty to arrange another 20-gram crack transaction. During the set up call, which I monitored, the CI asked Beatty to meet us for another deal. Beatty responded that he was "all out" and had to meet with his source, then needed time "to cook it up." Once again, during the transaction, I weighed the substance that Beatty sold to me on a digital scale. After I "zero'd out" the digital scale at Beatty's request, Beatty placed a package of an off-white, rock-like substance on my scale, which registered 20.3 grams. The substance appeared to me to be wet from the powder-to-crack conversion process, so I asked Beatty if it "was still wet?" Beatty replied that it was not, at which point I handed $1500 to Beatty. Based on my training and experience, the color, texture and appearance of the substance that Beatty sold to me on March 17, 2005 (Exhibit 108) was consistent in appearance of crack cocaine.

11.    Exhibit 128: On May 6, 2005, I called Beatty to arrange another crack cocaine transaction. This transaction was never completed because we arrested Beatty before I gave him the money for the crack cocaine. Beatty told me that he could supply me with $1500 worth of cocaine, but "it will be all powder, though." I told Beatty that I had been getting crack cocaine from a different source at a cheaper price, but noted that Beatty's was "cooked perfect," while my other source's crack was only "decent." In response, Beatty stated that I was getting a better understanding of the differences in how people cook cocaine into crack. Beatty explained to me that "what they do, they run it through the first cook, and it swells ... what happens is it swells

5

with the baking soda..... So, it looks like yellow, [a]nd it's going to weigh more than baking ... it's heavier than the stuff itself." I replied that this made sense because the crack I got from my other source looked like "popcorn." Beatty responded "[e]xaclty" .... one day ... I'll show you how it's done." Beatty then noted that this is why his prices seem a little steep -- because he always does it the right way, stating "I cook it twice to make sure everything is out of it. That it's nothing but pure oil." Based on my training and experience, Beatty's statements about "cooking," "baking soda," and "baking," refer to the process of Beatty converting powder cocaine into crack cocaine. This telephone conversation between Beatty and me was recorded. I prepared the attached transcript, identified as **Exhibit 2(A)**, which is a true and accurate transcript of this recorded conversation on May 6, 2005, in which Beatty and I agreed to meet the following Monday, May 9, 2005, when I would purchase 25 grams of crack cocaine (Exhibit 128) from Beatty for $1650.

      12.     On May 9, 2005, I had a recorded telephone conversation with Beatty at approximately 4:15 p.m. to arrange for the purchase of 25 grams of crack cocaine for $1650, as we agreed on May 6, 2005. During this conversation, Beatty told me that he would not be able to meet me until after 5:00 p.m. because he still had to get powder cocaine from his source, then convert the powder cocaine into crack cocaine for me. I prepared the attached transcript, identified as **Exhibit 2(B)**, which is a true and accurate transcript of this recorded conversation on May 9, 2005, in which Beatty stated, "What I ... what I got to do is I got to order it.... I'll order it on my way in, when I'm close enough to order it.... And then ... I ... um, then I got to make it for you." I replied, "Oh, okay. You've still got to cook it, huh?" Beatty responded, "yeah." See **Exhibit 2(B)** at 1.

6

13.     Beatty and I ultimately met at a pre-arranged location at approximately 7:05 p.m. that evening (May 9, 2005). Before doing so, surveillance agents, who were stationed outside of Beatty's residence at 18 Musket Drive, Fitchburg, told me that they observed Beatty arrive at his residence at approximately 6:18 p.m., where he stayed until approximately 7:00 p.m. During this time, I placed a recorded telephone call to Beatty to ask where he was. Beatty told me, "I'm just getting it ready for you now." When I told Beatty that I was already waiting for him at the pre-arranged location, he replied, "I just got to get it ready." I prepared the attached transcript, identified as **Exhibit 2(C)**, which is a true and accurate transcript of this recorded conversation, which took place at 6:23 p.m. Based on my training and experience, Beatty's statements meant that he was cooking powder cocaine into crack cocaine for me. Consistent with this understanding, surveillance agents told me that they observed Beatty leave his residence at approximately 7:00 p.m. Beatty then met me at approximately 7:05 p.m., at which time I leaned in the open passenger side window of Beatty's Jeep Cherokee, while Beatty remained seated in the driver's position. Beatty directed me to retrieve Exhibit 128 from the middle of his front passenger seat so that I could weigh it. Rather than complete the exchange, a signal to arrest Beatty was made and law enforcement officers working on this investigation with me converged on the Jeep Cherokee and arrested Beatty. The substance that Beatty gave me, which was marked as Exhibit 128, was an off-white, chunky rock-like substance, which based on my training and experience, looked like crack cocaine.

14.     Exhibit 130: Finally, according to my review of law enforcement reports and discussions with other law enforcement officers involved in this matter, later that day, May 9, 2005, officers executed a search warrant at Beatty's residence at 18 Musket Drive, Building 3,

7

Apartment 2A in Fitchburg. Inside Beatty's residence, officers seized cut baggies with cocaine residue and various paperwork and bank records. The next day, May 10, 2005, a Leominster Police detective who assisted with the search warrant received a call from management at Heritage Gardens, the complex where Beatty resides and where the search warrant was executed. The manager told the detective that an unnamed maintenance worker found some cocaine and a scale hidden in a hallway ceiling panel directly outside of Beatty's apartment. The Leominster Police detective went to Heritage Gardens and retrieved a quantity of crack cocaine and the scale, which was a small digital scale. The detective turned the crack cocaine and the scale over to DEA. DEA marked the cracked cocaine as Exhibit 130, which I examined before a fellow DEA agent sent the substance to the DEA laboratory. The substance was chunky and rock-like in appearance and off-white in color, and based on my training and experience, looked like crack cocaine.


SWORN UNDER THE PAINS AND PENALTIES OF PERJURY THIS 26 DAY OF SEPTEMBER, 2006:



STEVEN C. STORY
Special Agent
Drug Enforcement Administration


8

# EXHIBIT 2(A)

**Outgoing call to cellular telephone (978) 235-0735**
**11:50 a.m. on 05-06-2005 (Exhibit N-309)**

**LB ("Leo") – Leo BEATTY**
**SS ("Steve") – S/A Steven Story**

LB:    Hello.

SS:    Hey Leo, this is Steve from New Hampshire. ⬛'s friend.

LB:    Who?

SS:    Steve from New Hampshire. You know… ⬛'s… ⬛'s buddy.

LB:    Oh, yeah, yeah, yeah. What's up?

SS:    Hey, how are you doing dude?

LB:    Alright.

SS:    Hey, I'm sorry I haven't seen you for a long time. I kind of had a hard time hooking up with ⬛ here and there and then… you know… I had to find him to find you.

LB:    Uh huh, uh huh, uh huh.

SS:    And then I ended finding… there's another dude, a Spanish kid, I was… I was getting a good price off of basically… ah, you know… spending the same fifteen, but I was getting a whole… a whole one. You know?

LB:    Ah huh.

SS:    Um… But, he… he took off… he was in… he was living up in New Hampshire, but he's fucking gone back to New York or some bullshit so…

LB:    Okay.

SS:    But anyways, I was… I'm going to be heading way up north… you know… going up to Maine and… ah… grabbing… grabbing something this weekend…

LB:    Ah huh.

SS:    And… ah… I wasn't sure if you still wanted to… ah… work out…

LB:    Well…

SS:    … a trade or something on Monday.

LB:    Uh huh… Yes. Ah, I kind don't… hmm… I don't know… I… I… that's what I was thinking, I… I… you know… that's a touch and go thing with me. You know what I mean?

SS:    Is it? You can't move it that good?

LB:    Ah…no, 'cause I'm… I'm… you know, I'm going with certain other things. You know what I mean?

SS:    Yeah. Um…

LB:    I… I… I… (unintelligible)

SS:    What's that?

LB:    Like, (unintelligible) I can you, like the whole things, right?

SS:    Yep

LB:    But… but… (unintelligible due to poor cellular connection), you know what I mean?

SS:    Nope, I… I… I lost you there, I was in a bad… a bad site, or you were. Can you hear me at all?

LB:    (Unintelligible)

1

SS: Hey, I'm going to call you… I'm going to call you right back. I'm on a bad cell right here.
LB: Okay, Steve.
SS: I'll call you right back.


LB: Hello.
SS: Hey Leo, Steve again.
LB: Okay.
SS: Hey dude, I get the worst friggin cell service up in New Hampshire. It blows.
LB: Oh…
SS: Um…
LB: Yeah, like I said, I can get you… I can get you, like almost the same deal, right? But it will be all powder, though.
SS: Oh, it will, no shit.
LB: Yeah, see that's the thing.
SS: No, see, I thought yours was cooked perfect. You know? The other… I was getting a full "z" of the cooked from the other kid… you know… but, it was decent…
LB: What was it like?
SS: Decent, not… not… not as good as yours had been… you know… but I….
LB: But you know what? I tell you something too, though. You know, so you get a better understanding of what's the differences. You ever look… you noticed how mines go, right?
SS: Yeah.
LB: When you burn ours, all real, real oily, with residue and all that stuff like that?
SS: Yeah.
LB: Because I do it, I cook it twice.
SS: Oh, you do? No shit.
LB: Yeah, see, a lot of people… I'm gonna tell you now, like you're think the dude is giving you a good deal….
SS: Yeah.
LB: But what they do, they run it through the first cook, and it swells… what happens is it swells with the baking soda.
SS: Oh, fuck.
LB: So, it looks like yellow. And it's going to weigh way more then baking… its heavier than the stuff itself.
SS: Yeah, yeah, 'cause this shit looks kind of like popcorn. You know?
LB: Exactly. And that's what… you know… one day, I'll… I'll show you how it's done…
SS: Yeah.
LB: And you'll be like, "Oh shit, that's what's happening."
SS: Oh, okay. I see how… I thought it was good 'cause I was getting another eight… you know… 'cause…
LB: Yeah, yeah, but… yeah, but… you know, it's not what you think you're getting. And sometimes… a lot of times… well, you going to have to re-cook it.

2

111

SS:    Ah... geez.

LB:    Well, I can show you how to do that, but, but, I mean, I... I... I don't... you know... Tony forces it because I always do the things the right way.   My... my... sometimes, my price seems a little steep, but I'm always correct.   But I'll always tell a person, if they don't like it... do you know what I mean?

SS:    Yeah.

LB:    You can always turn it back in.

SS:    No, I never... you know... I never had any problems it, except for that... you know... one time when it was a little short, but that was no big deal 'cause it...

LB:    Yeah, but no, no, no... I... I... I... I... I'm gonna tell you.   I gave Tony the whole thing.

SS:    Yeah?

LB:    He took... he quick handed you.   That's what happened.

SS:    Oh, really?

LB:    You know, so....

SS:    Oh, that's fucked up because I take care of him on my end too.

LB:    Yeah, but you... you... come on.

SS:    (laughs)

LB:    I... ah... I mean, between me and you, but I didn't want to say nothing.   You know what I mean?

SS:    Yeah.

LB:    You know, I was... I was kind of stuck in the middle.

SS:    Yeah.

LB:    You know what I mean?   But I... I... you know, I... I... I even took care of him a little bit on my end, 'cause I... 'cause I didn't want him to do that.

SS:    Alright.   He was making out good all around.   I didn't even tell him about this other dude I was going to, because he was going to hound the shit out of me.   I mean, he... he's a good bastard, but he...

LB:    Yeah, alright, but see the thing of it is though, is that I... you know... I've seen a lot of times when I do things for people....

SS:    Yeah.

LB:    They turn around and cut the other person short.   I said, "you know." I say, "you think you're doing good, you know, but that makes it look bad for me."

SS:    Yeah.

LB:    People think I'm doing it lazy.   Like, oh, don't worry about it, they going straight and I'm like, alright, whatever.

SS:    (laughs)

LB:    You know?

SS:    Yeah.

LB:    Hey, could you hold on a minute?

SS:    Yep.

LB:    Oh, never mind.   I missed the call anyway.

SS:    Oh, sorry about that.   Yeah, so, uhm... you think, I mean, I was... the way I'm grabbing this... this green is beautiful now.   It's coming in even better than before, uhm...

LB:    Uh hmm.

SS:   It's in….it's in vacuum-sealed, one pound bags. But… you know… it's already bagged up as one, and it's… and it's vacuumed sealed up there. You know?

LB:   Uh huh.

SS:   Um… so we're not cut… we're trying not to cut into them because as soon as you cut into the bag… you know… how…

LB:   Right. It swells up.

SS:   Yeah, it swells up and you lose your freshness and shit, and then some… then people don't want it if it's… if they've seen it cut into, unless you're cutting it up smaller than that, you know?

LB:   Right, right, right.

SS:   But… uhm… I was thinking I could do a one-for-one trade… you know… if you wanted that much. If you wanted a pound or two… um….

LB:   No, I… I… I really… I don't move it like that. You know, I just have a few dudes that ask me. You know what I mean?

SS:   Yeah, it's too much 'cause it would…. it would go stale, huh?

LB:   Yeah, so I mean, I would be holding on it forever.

SS:   Yeah, you don't want to do that with this shit cause it's… it's… it's so high end… you know… you want it to be nice and fresh, 'cause it's not like commercial stuff, you can just sit around on. You know?

LB:   Right, right, right. See that's the thing, I don't have no people like that, so….

SS:   Um… okay. So… um… that's probably… that probably wouldn't do you any good then.

LB:   No. But I mean… I don't know. I'm trying to work something with people… but no… that's… that's… that's the real deal. When I gave you, like I said, when you break mine, it's always real, real, real hard…

SS:   Yeah, it is.

LB:   … and it's solid all the way through.

SS:   Yep.

LB:   Like I said, because I cook it twice to make sure everything is out of it. That it's nothing but pure oil. As a matter of fact, you can take it and rub it in your fingers….

SS:   Yeah.

LB:   Right, and you get it oily, then it'll dry and turn real hard again right in your hand.

SS:   Oh, nice. Yeah, I thought I was doing good at first with this kid, he's a young, Spanish punk. He came to Milford… do you know, Milford… ah… up in…not too far away?

LB:   Yeah, yeah, yep, yep, yep, yep, yep.

SS:   He moved up there for awhile and he was, living large 'cause he… you know… he came into town and… and, you know… he was able to knock "z's" out and shit, but then I… you know… started to get a little aggravated because, like I said, the popcorn is… ah… a little lame.

LB:   Yeah, how will… what about the stuff that you was grabbing from me, though, how was that?

SS:   That was great. You know, that was real good. I just… um… I should have stuck with it, probably… you know… I thought since I was going to be getting eight more… you know… eight more… ah… through him.

4                                                                    113

LB: Right. But it's not really, like, what you…what you… what you think it is.
SS: Right. Right.
LB: You know what I mean?
SS: Um…
LB: Like I said, I never had any… I mean, come on, 'cause some people come all the way from over there to come grab it from me. You know what I mean?
SS: Yeah, yeah.
LB: You know? I still have people from up your way coming down here.
SS: Oh, that's good, that's…
LB: And you know what, the… the thing of it is, they come, even if… even if… even if they just getting a hundred dollar piece, they come all the way down here for it.
SS: Wow.
LB: But they say, "I'd rather make the trip and get something I know is going to be worth it, then to throw my money away up there."
SS: Oh, right… no that's… that's true, I mean, you can… you can get ripped off in many different ways and it pisses you off for a long time. You know?
LB: You're right. And in the end, you wind up losing.
SS: Yep.
LB: You know? Oh, like I said, I….
SS: What's that?
LB: I… I'll… I'll try to work with you… you know, get you a little more for your money. You know what I mean?
SS: Yeah, what's… what's the best I could stretch… ah… for fifteen, you think?
LB: (sigh)
SS: 'Cause we were doing twenty before and…
LB: I'll tell you what you do.
SS: What's that?
LB: I'll make it even better for you.
SS: Yep.
LB: For… for… let's see what I do. I'll tell you what I'll do, for… for sixteen-fifty?
SS: Yep.
LB: I'll give you twenty five.
SS: Oh, okay. Nice. Nice.
LB: So you're only paying… you're getting five more for a hundred and fifty dollars.
SS: Oh, man, can't go wrong with that. That is good. Okay.
LB: I'll give you twenty-five, how does that sound?
SS: That's… that's good. Do you think I can grab that on Monday?
LB: Ah… yeah, but let me know ahead of time, so I can grab it for you.
SS: Okay, yeah, you know what I… I'll definitely come down… ah… I'll definitely come down on Monday. Ah… I'm only working until… ah… one, so I could… so I'll change and I could come down there. Can I… can I hit you up at like two or so?
LB: Ah…yeah.
SS: That'll be good?
LB: Yeah.

5

114

SS:    Okay, cool.  I'll call you... I'll call you when I'm coming down.  Um... when... when I'm... when I'm on the road.

LB:    Alright, so you want me to do that for you?

SS:    Yeah, that'll be beautiful.

LB:    Yeah, 'cause, I mean, you... you're close to a whole thing.

SS:    Yeah.

LB:    You know your shit's gonna be good.

SS:    And I'll... ah... I'll take care of Tony on it... you know... 'cause I don't want to fuck him.  I'll take care of him afterwards when I finally... you know... track him down and shit... you know... But...

LB:    Right.

SS:    ... that it'll be easier than him hitting you and hitting me.

LB:    Yeah.

SS:    (laughs)  He's good at working everything.

LB:    Yeah, that's Tony though.

SS:    Until I...ah... I won't even mess...I won't even mess with bringing the green down now.  I'll just...I'll just turn some over for the cash and... ah...

LB:    Alright.

SS:    'Cause you can't... you can't dig into a whole one, right?

LB:    Ah... no, I can't.

SS:    Okay, cool.

LB:    It'll be too much... it'll be too much for me.

SS:    Alright.

LB:    I wish I could, but you know what I mean?

SS:    Yeah.

LB:    I just don't... I don't have the people for it.

SS:    Alright.

LB:    Maybe down the road, what... what I'll....what I'll do is I'll start asking around and maybe I'll be able to do it.

SS:    Yep.

LB:    You know what I mean?  But as of right now, I won't be able to do that.

SS:    Cool, okay.

LB:    Alright.  So, I'll see you on Monday then, huh?

SS:    Yeah, that'll be a definite.  I'll call you when I'm... when I'm on the road.

LB:    Alright.

SS:    Awesome.  Thanks again.  Take it easy.

LB:    Alright then.

SS:    Yeah, bye.

LB:    Yeah, bye.

# EXHIBIT 2(B)

**Outgoing call to cellular telephone (978) 235-0735
4:15 p.m. on 05-09-2005 (Exhibit N-309)**

**LB ("Leo") – Leo BEATTY**
**SS ("Steve") – S/A Steven Story**

LB:    Hello.
SS:    Hey Leo, it's Steve.
LB:    Hey, what's up Steve?
SS:    Hey dude, how you… how are you making out?
LB:    I'm on my way back now.
SS:    Oh, okay, cool.  How long do think you it would take?
LB:    Oh… takes about… takes about fifty minutes to get back to Fitchburg.
SS:    Oh, no shit, you're that far out, huh?
LB:    Yeah, I'm out by… ah… by Peabody.
SS:    Oh, okay.  Um… alright… I'll… ah… so what… what does it look like, then…
       ah… like, four thirty or so?  Quarter of, what… what… let me see what time it is.
LB:    What time is it now?  What time is it?
SS:    It is… ah… shit, I always look at my cell phone.
LB:    What time were we looking at?
SS:    Uhm, yeah, it's four-fifteen… so… ah… Oh yeah, so its going to be after five
       then, huh?
LB:    Yeah.
SS:    Uhm, alright, do you want me to call you back at five?
LB:    Well, it'll be… it'll be after five.
SS:    Okay.
LB:    What I… what I got to do is I got to order it… I'll order it on my way in, when
       I'm close enough to order it.
SS:    Yep.
LB:    And then… I… um… then I got to make it for you.
SS:    Oh, okay.  You've still got to cook it, huh?
LB:    Yeah.
SS:    Ah… then I got to kill some time, then, huh?
LB:    No, it don't take that long to do that.
SS:    Okay.
LB:    Once I get it.
SS:    Alright.  I'll… ah… I'll call you back in an hour then or so, just to check in and
       see how things are going?
LB:    Alright.  That's good.
SS:    Alright.  Cool.  Alright, dude.
LB:    You want it definitely, right?
SS:    Oh, yeah.  Definitely.
LB:    Okay.
SS:    Yeah, 'cause we're just hanging out for it, cause we're… um….

1

118

LB:   Alright.

SS:   We're all done with dropping the other stuff.  You know?

LB:   Okay.

SS:   Alright.  Cool.  Alright. LB:  Okay.

SS:   See you.

119

# EXHIBIT 2(C)

Outgoing call to cellular telephone (978) 235-0735
6:23 p.m. on 05-09-2005 (Exhibit N-309)

**LB ("Leo") – Leo BEATTY**
**SS ("Steve") – S/A Steven Story**

LB:   Hello.
SS:   Yo Leo, its Steve.
LB:   Yeah, Steve.  I'm just getting it ready for you now… I'm getting… getting it ready for you'now.
SS:   Oh, cool, 'cause I'm just killing some time here.
LB:   Where… where are you?
SS:   Ah… at the Wal-Mart.
LB:   Oh, okay.  It's gonna… I just got to get it ready.
SS:   Okay.
LB:   Alright?
SS:   Did you… did you catch the message? Do you want to call me back on that number?
LB:   Oh, no.  I didn't get… I didn't check my messages yet 'cause I was in a hurry.
SS:   Oh, okay.  I'll… ah… do you want me to call you back in a little bit?
LB:   Ah… yeah.
SS:   Okay.  How much time?
LB:   Alright.  Bye.
SS:   Alright.  Bye.

1

120

# EXHIBIT 3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

United States of America,    )
                Plaintiff,    )
                              )
                              )
vs.                           )    CR No. 05-40021-FDS
                              )
                              )
Leo Beatty,                   )
                Defendant.    )

BEFORE:   The Honorable F. Dennis Saylor, IV

Rule 11

United States District Court
Courtroom No. 2
595 Main Street
Worcester, Massachusetts
Wednesday, May 3, 2006

Marianne Kusa-Ryll, RMR, CRR
Official Court Reporter
United States District Court
595 Main Street, Room 514A
Worcester, MA 01608-2093
Mechanical Steno - Transcript by Computer

1        THE COURT:  All right.  Mr. Beatty, do you disagree

2    with anything in the government's description of the facts?

3        THE DEFENDANT:  Yes, your Honor.

4        MR. PARKER:  Your Honor, we're not admitting either to

5    weight or to the substance being crack.  We are admitting to

6    the substance being cocaine base.

7        THE COURT:  Well, hold on.  The indictment charges

8    that he did knowingly and intentionally distribute a quantity

9    of cocaine base, also known as crack cocaine, I think, in all

10   four counts.

11        MR. PARKER:  That's right, your Honor.  We're

12   admitting to cocaine base.  We're not admitting that there's an

13   absolute equivalency between crack cocaine and cocaine base, or

14   that all cocaine base is also known as crack cocaine, and I

15   don't believe that we have to in order to satisfy the elements

16   of the statute for terms of a plea.

17        THE COURT:  Ms. Asiaf, what's the government's

18   position on this?

19        MS. ASIAF:  Your Honor, because the indictment does

20   specifically set forth that he intentionally distributed

21   cocaine base, also known as crack, and that the weights, at

22   least as to Counts 2 through 4, involved at least 5 grams,

23   kicking in those mandatory minimums, the government's position

24   would be that he'd have to agree to the weights that at least

25   they went over the 5 grams on Counts 2 through 4.

1          As to the precise substance of the crack, I believe

2     that the law is that it just has to be a controlled substance.

3          THE COURT:  All right.  Let's -- let's take this a

4     step at a time.

5          Does the defendant dispute as to Counts 2, 3, and 4

6     that the offense involved at least 5 grams of a mixture or

7     substance containing a detectable amount of cocaine base?

8          MR. PARKER:  I don't believe that we'd have to admit

9     to that, Judge; so for purposes of the plea, we're not prepared

10    to.

11         THE COURT:  Ms. Asiaf.

12         MS. ASIAF:  Your Honor, I would have to go research

13    this issue, to tell you the truth.  My understanding -- I think

14    he's correct, from my general understanding, that for purposes

15    of accepting a plea, that you don't have to find that it was

16    actually crack, and that we could dispute and have a sort of

17    mini trial, an evidentiary hearing on the weight.

18         THE COURT:  Well --

19         MS. ASIAF:  It's up to your Honor whether, you know,

20    you want to take a break for me to look at that issue, or if

21    your Honor knows the answer to that question.

22         THE COURT:  The statute prohibits the distribution of

23    cocaine base, and crack cocaine is handled differently under

24    the guidelines or otherwise than cocaine base, and I

25    think -- if I have this right, he can admit to cocaine base,

1   and then we can have a trial to determine whether it involved

2   crack, or freebase, or some other form of cocaine base; that

3   is, we can have an evidentiary hearing; and just so that it's

4   clear, my view is that that hearing would be before me; that

5   there would be no right to a jury; and that the standard would

6   be a preponderance of the evidence.

7            In terms of the admission to the drug weight itself,

8   let me take a look at 841(b).  Well, I guess what I'm prepared

9   to find is that that is a penalty provision; that is, there is

10  a greater penalty for an amount of drug weight that exceeds

11  5 grams; that the defendant can plead guilty to distribution of

12  cocaine base without agreeing to a specific drug amount or drug

13  weight, and that again would be a matter for the Court to

14  determine at sentencing.

15           I guess what I would propose to do is to take the

16  plea.  If for some reason the government thinks that that's not

17  appropriate, I would schedule it and give the defendant an

18  opportunity to -- I could either vacate the plea, or give

19  the -- you know, we could revisit the issue if -- and I'm not

20  articulating this very careful -- carefully; but in other

21  words, I'd be prepared to take the plea; that it is a plea only

22  to cocaine base distribution; the nature of the substance, that

23  is, whether it's crack or not, and the drug weight to be

24  determined at a later sentencing hearing; and if prior to the

25  sentencing hearing, if the government thinks I have that wrong,

1    I'd be prepared to hear the government and either vacate the

2    plea, or otherwise attend to the issue.

3              Does that make sense?

4              MS. ASIAF:  That makes sense, your Honor.

5              THE COURT:  Mr. Parker.

6              MR. PARKER:  Yes, your Honor.

7              THE COURT:  And, again, Mr. Parker, obviously, this is

8    an area where the law is in some flux, and I want to make sure

9    that you are preserving whatever issues you want to preserve.

10             It's -- as I read the law, as it now stands, both drug

11   weight and the nature of the cocaine base are -- are issues

12   that I am to determine, not a jury, and by a preponderance of

13   the evidence standard.

14             Is there anything you wish to say in terms of

15   preserving your rights in that regard?

16             MR. PARKER:  Just that I think that the standard has

17   to be beyond a reasonable doubt.

18             THE COURT:  Okay.

19             MR. PARKER:  But I think you can find it, as opposed

20   to a jury using that standard.

21             THE COURT:  All right.  Well, we can take that issue

22   up at sentencing as well.

23             All right.

24             (Counsel conferred with the Defendant.)

25             THE COURT:  All right.  Mr. Beatty, other than

1    the -- the fact that you don't admit that it was crack cocaine,

2    and that you don't admit to the drug weights, is there anything

3    else that you disagree with in the government's description of

4    the crack?

5              THE DEFENDANT:  No, your Honor.

6              THE COURT:  All right.  Is there any other reason I

7    should -- or is there any reason I should not take the change

8    of plea now?

9              Ms. Asiaf.

10             MS. ASIAF:  No, your Honor.

11             THE COURT:  Mr. Parker.

12             MR. PARKER:  No, your Honor.

13             THE COURT:  All right.  Mr. Castles, then I'm prepared

14   to take the change of plea.

15             THE CLERK:  Please stand.

16             Leo Beatty, on criminal No. 05-40021, on Counts 1

17   through 4 of a four-count indictment, you have previously pled

18   not guilty.

19             Do you now wish to change your plea?

20             THE DEFENDANT:  Um, yes.

21             THE COURT:  What say you now as to Count 1, guilty or

22   not guilty?

23             THE DEFENDANT:  What is Count 1?

24             (The Defendant conferred with counsel.)

25             THE DEFENDANT:  I just have one question.  On the

1    count of aiding and abetting, I don't -- I never understood

2    what that charge was what about -- what that charge was what

3    about.

4           THE COURT:  All right.  What the -- the law concerning

5    aiding and abetting basically says that if you aid and abet,

6    which is another way of saying help someone else to commit a

7    crime, you're just as guilty as the person who committed the

8    crime.

9           So that if -- let's say someone else sold drugs, and

10   what you did is you drove that person to the drug deal, and you

11   helped serve as a lookout, and maybe you carried the drugs in

12   your pocket and handed it to him at the last minute, you could

13   be just as guilty of selling drugs as the person who sold the

14   drugs.

15          THE DEFENDANT:  All right.

16          THE COURT:  I don't -- the indictment charges aiding

17   and abetting.  I don't know whether there's another person

18   involved in the transaction.

19          Ms. Asiaf.

20          MS. ASIAF:  No, your Honor.

21          (The Defendant conferred with counsel.)

22          THE COURT:  You -- you are indicted for distribution

23   of cocaine base.  You are pleading guilty, in substance, to

24   distribution of cocaine base.  I don't think the aiding and

25   abetting charge really makes much difference one way or the

1  other.

2          Ms. Asiaf, I'm not sure I understand.

3          MS. ASIAF:  That's correct, your Honor.  At the

4  indictment stage, you know, we put it in; and at this stage of

5  the game, it's really the principal distribution count that

6  applies here.  He did all the -- he did all the deals himself.

7          THE COURT:  As I understand the factual basis, it's

8  really not an aiding and abetting offense.  It's a -- you're

9  accused of having distributed cocaine base yourself.  I mean, I

10  understand that there's a factual basis for that.

11          Mr. Parker, anything you want to say on that in this

12  regard?

13          MR. PARKER:  I don't, Judge.  You know, it seems like

14  we're getting into a position where he doesn't have to plead to

15  aiding and abetting.  He pleads to distribution, the

16  substantive violation in each count.

17          THE COURT:  Ms. Asiaf.

18          MS. ASIAF:  Yes, your Honor, I agree.

19          THE COURT:  All right.  Why don't I take a plea to

20  distribution of cocaine base.  Aiding and abetting is not

21  charged in a separate count.

22          Is the government prepared to dismiss whatever aiding

23  and abetting claim may exist --

24          MS. ASIAF:  Yes, your Honor.

25          THE COURT:  -- Ms. Asiaf?

1          All right.  Is there any objection to that?

2          MR. PARKER:  No, your Honor.

3          THE COURT:  All right.  On what I will deem to be

4   motion of the government, the aiding and abetting counts or

5   claims -- it's not really a count -- are dismissed, and the

6   defendant is pleading guilty to distribution of cocaine base in

7   violation of 21 USC, Section 841(a)(1).

8          Mr. Parker, any objection to that?

9          MR. PARKER:  No, your Honor.

10          THE COURT:  All right.  Let's try this again then.

11   All four counts, distribution of cocaine base.

12          THE CLERK:  What say you now as to Count 1, guilty or

13   not guilty?

14          THE DEFENDANT:  Guilty.

15          THE CLERK:  As to Count 2, guilty or not guilty?

16          THE DEFENDANT:  Guilty.

17          THE CLERK:  As to Count 3, guilty or not guilty?

18          THE DEFENDANT:  Guilty.

19          THE CLERK:  As to Count 4, guilty or not guilty?

20          THE DEFENDANT:  Guilty.

21          THE CLERK:  You may be seated.

22          THE COURT:  All right.  It is the finding of the Court

23   in the case of the United States versus Leo Beatty that the

24   defendant is fully competent and capable of entering an

25   informed plea; that the defendant is aware of the nature of the

1  charges and the consequences of the plea; and that the plea of

2  guilty is a knowing and voluntary plea, supported by an

3  independent basis in fact containing each of the essential

4  elements of the offense.  The plea is therefore accepted, and

5  the defendant is now adjudged guilty of the offenses charged.

6  Mr. Beatty, a written presentence report will be

7  prepared by the probation office, as I indicated, to assist me

8  in determining your sentence.  You will be asked to give

9  information for that report.  Your attorney may be present, if

10  you so choose.

11  It is important that the presentence report be

12  accurate.  If you are sentenced to prison, for example, it may

13  determine where you go to prison, what happens when you get

14  there, even things such as who can visit you; so, you should

15  try to make sure that the presentence report is as accurate as

16  you can make it.  No detail is too small to correct, if it

17  isn't right.

18  You will have an opportunity, obviously, to read the

19  presentence report, as will your lawyer, and to file any

20  objections to the report before the time of sentencing.

21  Both you and your lawyer will have an opportunity to

22  speak on your behalf at the sentencing hearing.

23  I'm therefore going to refer you to the probation

24  department for a presentence investigation and report.  I will

25  set the date of sentencing for Wednesday, August 9th, 2006, at

1    two o'clock p.m.

2              Is there any problem with that date?

3              MR. PARKER:  No, your Honor.

4              MS. ASIAF:  No, your Honor.

5              THE COURT:  All right.  The next matter I want to take

6    up is the filing of the 851 information.

7              Mr. Beatty, have you had a chance to go over this

8    document, which is an information charging that you were

9    previously convicted of certain offenses in the past?

10             Have you had a chance to go over that with your

11   lawyer?

12             THE DEFENDANT:  No, I understand what it is, your

13   Honor.

14             THE COURT:  Well -- do you understand what it is?

15             THE DEFENDANT:  A 851, it doubles my minimum

16   mandatory, your Honor.

17             THE COURT:  Right.  What I want to -- what I'm asking

18   is:  The government has filed this piece of paper.

19             THE DEFENDANT:  Uh-huh.

20             THE COURT:  And really what I want to know is do you

21   understand what it is, and have you had a chance to go over it

22   with your lawyer?

23             THE DEFENDANT:  Yeah, basically, yes, your Honor.

24             THE COURT:  Okay.  And have you had a chance to go

25   over it with Mr. Parker?

1          THE DEFENDANT:  Yes.

2          THE COURT:  All right.  And, now, I'm going to ask you

3     some questions about whether you are the person who's

4     identified here.

5          Are you the same Leo Beatty, who was convicted on or

6     about August 4th, 1994, in the Worcester Superior Court in

7     Worcester, Massachusetts, of trafficking in a controlled

8     substance, cocaine, Criminal Docket No. 93-06861; and

9     distributing and dispensing a Class B controlled substance,

10    cocaine, Criminal Docket No. 93-06862?

11         THE DEFENDANT:  Yes, your Honor.

12         THE COURT:  The answer was yes?

13         THE DEFENDANT:  Yes, your Honor.

14         THE COURT:  All right.  And are you the same Leo

15    Beatty, who was convicted on or about August 15, 1994, in the

16    Worcester Superior Court, Worcester, Massachusetts, of

17    conspiracy to violate the Controlled Substances Act by

18    trafficking cocaine, Criminal Docket No. 93-06863; and

19    conspiracy to violate the Controlled Substances Act by

20    distributing a Class B controlled substance, cocaine --

21         THE DEFENDANT:  No, your Honor.

22         THE COURT:  -- Criminal Docket No. 93-06866?

23         MR. PARKER:  He's asking if that's you.

24         THE DEFENDANT:  Yes.  Yes, your Honor.

25         THE COURT:  Yes, you are the same person?

1             THE DEFENDANT:  Yes.

2             THE COURT:  All right.  And are you the same Leo

3     Beatty, who was convicted on or about November 30th, 1992, in

4     the Worcester Superior Court, Worcester, Massachusetts, of

5     conspiracy to violate the Controlled Substances Act, by

6     trafficking cocaine, Criminal Docket No. 92-0094C?

7             THE DEFENDANT:  No, your Honor.

8             THE COURT:  All right.  You deny that?

9             THE DEFENDANT:  I deny that, yeah.

10            THE COURT:  All right.  And do you under -- understand

11    that any challenge to one of these three convictions, which is

12    not made prior to the time that I impose sentence in this case,

13    can't be raised thereafter to attack the sentence; do you

14    understand that?

15            Do you want a moment with your lawyer?

16            THE DEFENDANT:  I just had kind of a question/answer,

17    your Honor.

18            THE COURT:  Yes.

19            THE DEFENDANT:  When I was convicted in 1994, ah, my

20    case was severed.  I had conspiracy charges, and I also had the

21    original charges of trafficking and so on.  I was convicted on

22    the first part.  I forgot the exact date.  I guess it was about

23    August, and then maybe a month or so later they called me back

24    in on the conspiracy charges and just -- which I pled out to,

25    but it was all from one case.

1           THE COURT:  All right.  I guess my -- my answer to

2    that is how -- what effect this is going to have on your

3    sentence, that is --

4           THE DEFENDANT:  No, it's because --

5           THE COURT:  -- one pleading or two is going to be up

6    to your lawyer to argue and for me ultimately to decide.

7           THE DEFENDANT:  The only --

8           THE COURT:  All -- all I'm trying to figure out now

9    is -- is -- is do you admit that you were convicted on these

10   two different occasions of this offense?

11          THE DEFENDANT:  Yes, your Honor.

12          THE COURT:  All right.  And then you deny that you

13   were convicted on the 1992 offense, right?

14          THE DEFENDANT:  1990 -- when?

15          THE COURT:  '92.

16          THE DEFENDANT:  Oh, '92, yes, your Honor.  That was

17   conspiracy, correct?

18          THE COURT:  Yes.

19          THE DEFENDANT:  Yes, your Honor.

20          THE COURT:  All right.  And now the law requires that

21   I inform you of something, and what I'm trying to inform you of

22   is that any challenge that you may have to one of these prior

23   convictions, which is not made before I impose sentence in this

24   case, cannot be thereafter raised to attack the sentence.

25          Okay.  Do you understand that?

1    MR. PARKER: Judge, I don't know that I understand

2    that. I'm not sure that it's accurate. I think it's -- it's

3    my understanding that if he -- if Mr. Beatty were to go into

4    state court after this Court imposed a sentence and undid these

5    convictions, he could come back for a resentencing under 2255.

6    Your Honor may be right that he cannot challenge these

7    convictions in this Court at any time after his sentence, but

8    if something developed, and he went to state court and got rid

9    of these, there's a case law -- and I can't remember the name

10   of the case -- that he could come back on a 2255 for a

11   resentencing.

12   THE COURT: Let me leave it that the statute says that

13   I inform him of that fact. I'm going to inform him verbatim of

14   what the statute requires me to inform him of, and we can take

15   this up, as necessary, later on.

16   So, just so it's clear, I hereby inform you,

17   Mr. Beatty, that any challenge to a prior conviction, which is

18   not made before sentence is imposed, may not thereafter be

19   raised to attack the sentence. That's from Title 21, United

20   States Code, Section 851(b).

21   Is there anything else on the 851 issue, Ms. Asiaf?

22   MS. ASIAF: No, your Honor.

23   THE COURT: Mr. Parker?

24   MR. PARKER: No, your Honor.

25   THE COURT: All right. I also understand that the

1    defendant has been detained pending sentence; is that right?

2              MS. ASIAF:  Yes, your Honor.

3              THE COURT:  All right.  Unless there's anything in

4    that regard, I order that he remain detained pending sentence

5    under Section 3143(a)(2).

6              Is there anything further, Ms. Asiaf?

7              MS. ASIAF:  Nothing other than I missed the time on

8    August 9th.

9              THE COURT:  Two o'clock.

10             MS. ASIAF:  Thank you.

11             THE COURT:  Anything further from the defense?

12             (The Defendant conferred with counsel.)

13             MR. PARKER:  We have nothing else, your Honor.

14             THE COURT:  All right.  I will ask if for some reason

15   this is going to be an extended proceeding, in terms of

16   challenging the drug weight, or the substance, or whatever,

17   that you'd notify Mr. Castles and just make sure we have enough

18   time to get it accomplished.  That's all.  It looks like we

19   probably are allotting three hours here from 2:00 to 5:00.  If

20   it looks like the sentencing process is going to take longer

21   than that, if you can just give a heads up to the clerk, so we

22   can make sure we have enough time to get it done.

23             MS. ASIAF:  Yes, your Honor.

24             THE COURT:  Okay.  Anything else?

25             MS. ASIAF:  Nothing.

1     THE COURT:  All right.  We'll stand in recess.

2    (At 1:00 p.m., the matter was concluded.)

3

4

5       C E R T I F I C A T E

6

7     I, Marianne Kusa-Ryll, Certified Realtime

8 Reporter, do hereby certify that the foregoing transcript,

9 consisting of 32 pages, is a true and accurate transcription of

10 my stenographic notes in Case No. CR 05-40021-FDS, United

11 States of America vs. Leo Beatty, before F. Dennis Saylor, IV,

12 on Wednesday, May 3, 2006, to the best of my skill, knowledge,

13 and ability.

14

15

16        *Marianne Kusa-Ryll*

17      Marianne Kusa-Ryll, RMR, CRR

18      Official Court Reporter

19

20

21

22

23

24

25

# EXHIBIT 4

**Commonwealth of Massachusetts**
WORCESTER SUPERIOR COURT
Case Summary
Criminal Docket

03:57 PM

## WOCR1992-00094
## Commonwealth v Beatty, Leo G

| | | | | | |
|---|---|---|---|---|---|
| **File Date** | 02/10/1992 | **Status** | Disposed (sentenced) (dsenimp) | | |
| **Status Date** | 08/15/1994 | **Session** | 1 - Crim 1 (204 Worcester) | | |
| **Jury Trial** | Waived | **Origin** | I - Indictment | | |
| **Lead Case** | WOCR1992-00094 | | | | |

| | | | | | |
|---|---|---|---|---|---|
| **Arraignment** | 02/24/1992 | **Track** | I - Inventory | **Final PTC** | |
| **Disp. Deadline** | 02/23/1993 | **Deadline Status** Deadline active since return date | | **Status Date** | 02/11/1992 |
| **Pro Se Deft** | No | **Custody Status** Concord MCI | | **Start Date** | |
| **Weapon** | | **Substance** | | **Prior Record** | Unknown |

### OFFENSES

| Num | Offense | Code | Town | Status | Status Date |
|---|---|---|---|---|---|
| 1 | 09/26/1991 | 094C:032E:c1 | Fitchburg | Not guilty verdict | 06/25/1992 |
| | Traffic in heroin/morphine/opium, 14-28g | | | | |
| 2 | 09/26/1991 | 094C:032J | Fitchburg | Not guilty verdict | 06/25/1992 |
| | Controlled substnc, school property | | | | |
| 3 | 09/26/1991 | 094C:040 | Fitchburg | Guilty plea | 11/30/1992 |
| | Controlled substnc, conspiracy | | | | |
| 4 | 09/26/1991 | 094C:032J | Fitchburg | Not guilty verdict | 06/25/1992 |
| | Controlled substnc, school property | | | | |
| 5 | 09/26/1991 | 094C:034.1 | Fitchburg | Not guilty verdict | 06/25/1992 |
| | Controlled substnc, possess | | | | |
| 6 | 09/26/1991 | 094C:032A:a | Fitchburg | Not guilty verdict | 06/25/1992 |
| | Class B substnc, distrib/manufac | | | | |

### PARTIES

**Defendant**
Leo G Beatty
128 Fairmount St
Fitchburg, MA 01420
DOB: 05/30/1958
Gender: Male
Active 02/10/1992 Notify

**Plaintiff**
Commonwealth
Gender: Unknown
Active 02/10/1992

**Private Counsel 542782**
Leonard J Staples
77 Crosby Road
Ashburnham, MA 01430
Phone: 978-827-4600
Fax: 978-827-4600
Active 02/24/1992 Notify

A true copy by photostatic process
Attest:
        Asst. Clerk

*Catherine Brennan*

### ENTRIES

| Date | Paper | Text |
|---|---|---|
| 02/10/1992 | 1.0 | Indictment returned |
| 02/10/1992 | | Bail satisfied: 2,500.00 Cash, Surety: Sherry Hatch, 28 Boutelle St., |

222

WORCESTER SUPERIOR COURT
**Case Summary**
**Criminal Docket**

# WOCR1992-00094
## Commonwealth v Beatty, Leo G

| Date | Paper | Text |
|---|---|---|
| | | Leominster, #1953. |
| 02/11/1992 | | Summons for arraignment issued |
| 02/24/1992 | | Plea of not guilty - same bail |
| 02/24/1992 | | Conference and Report 3/13/92(Mulkern,J.) |
| 02/24/1992 | | Appointment of Counsel - Leonard J. Staples |
| 03/13/1992 | 2.0 | Pre-trial conference report filed in court and Approved(Mulkern,J.) |
| 03/13/1992 | 3.0 | Motion for State Payment of Costs, filed in court. |
| 03/20/1992 | 4.0 | Motion for State Payment of Costs, filed in court and ALLOWED - to be paid out of Office of Public Counsel(Mulkern,J.) |
| 03/30/1992 | 5.0 | Motion to Suppress and Affidavit in Support and Memorandum in Support, filed. |
| 03/30/1992 | 6.0 | Motion for Relief from Prejudicial Joinder and Affidavit in Support, filed. |
| 05/12/1992 | 7.0 | Commonwealth files Memorandum in Opposition to Defendant's Motion to Suppress Evidence, filed in court. |
| 05/29/1992 | | Motion (P#5) denied as agreed by the parties, the court has relied upon the statement of facts in the Commonwealth's Memorandum in reaching this conclusion(Travers,J.) |
| 06/22/1992 | | Check #6069, ($2500.00) BB#1953 to Sherry Hatch, Leominster, Ma. |
| 06/22/1992 | | Mo. #6 - No Action Needed(Cowin,J.) |
| 06/22/1992 | 8.0 | Motion in Limine to Exclude Impermissible References, filed. |
| 06/22/1992 | 9.0 | Motion to Sequester Witnesses, filed and ALLOWED(Cowin,J.) |
| 06/25/1992 | 10.0 | RE offense #1: Not guilty verdict - Defendant Discharged(Cowin,J.) |
| 06/25/1992 | 11.0 | RE offense #2: Not guilty verdict - Defendant Discharged(Cowin,J.) |
| 06/25/1992 | | RE offense #4: Not guilty verdict - Defendant Discharged(Cowin,J.) |
| 06/25/1992 | | RE offense #5: Not guilty verdict - Defendant Discharged(Cowin,J.) |
| 06/25/1992 | | RE offense #6: Not guilty verdict - Defendant Discharged(Cowin,J.) |
| 06/25/1992 | | Re offense #3: Still Pending(Cowin,J.) |
| 07/24/1992 | 12.0 | Motion for State Payment of Costs and Affidavit in Support, filed in court and ALLOWED if Needed(Mulkern,J.) |
| 08/07/1992 | 13.0 | Motion to Exclude Statements and Affidavit in Support and Memorandum in Support, filed. |
| 08/07/1992 | 14.0 | Motion to Dismiss Indictment or for Alternative Relief and Affidavit in Support and Memorandum in Support, filed. |
| 09/10/1992 | | Motion (P#13) denied after hearing(Travers,J.) |
| 09/10/1992 | | Motion (P#14) Entire Motion DENIED(Travers,J.) |
| 09/10/1992 | 15.0 | Commonwealth files Memorandum in Opposition to Defendant's Motion to Dismiss Indictment, filed in court. |
| 09/18/1992 | 16.0 | Motion to Withdraw and to Substitute Counsel and Affidavit in Support, filed in court and DENIED(Travers,J.) |
| 09/24/1992 | | Transcript received - 1 volume from J. Esposito. Waiting for copy from P. Hamilton (see file) |
| 10/29/1992 | | Bail Reduced from $2,500.00 to $1,000.00 Cash(Travers,J.) |
| 10/29/1992 | | Bail Warrant issued |
| 11/30/1992 | 17.0 | Commonwealth files Motion in Limine, filed. |
| 11/30/1992 | 18.0 | Motion to Sequester Witnesses, filed in court and ALLOWED(Donohue,J.) |

A true copy by photostatic process
Attest:
Asst. Clerk

Case 4:05-cv-40021-FDS Document 14-15 Filed 09/27/2006 Page 4 of 6

**Commonwealth of Massachusetts**
WORCESTER SUPERIOR COURT
Case Summary
Criminal Docket

## WOCR1992-00094
## Commonwealth v Beatty, Leo G

| Date | Paper | Text |
|------|-------|------|
| 11/30/1992 | | RE offense #3: Guilty plea |
| 11/30/1992 | | Sentence imposed: 5 yrs. M.C.I. Concord, 30 days to be served, |
| | | balance suspended and Placed on Probation 2 yrs., Credit 30 days |
| | | Chapter 279 Section 33A(Donohue,J.)V/W fee $50.00, Drug Costs $150.00 |
| | | and Prob. Fee $30.00 all to be paid while on Probation - Mittimus |
| | | issued |
| 11/30/1992 | 19.0 | Motion for Forfeiture, filed in court and ALLOWED(Donohue,J.) |
| 11/30/1992 | 20.0 | ORDERED: Order for Forfeiture(Donohue,J.) |
| 05/26/1993 | | Victim-witness fee paid as assessed $50.00 |
| 12/14/1993 | | Probation Surrender |
| 12/14/1993 | | Deft released on personal recognizance (Travers,J.) |
| 08/15/1994 | | Probable Cause Found/Probation Surrender; (Toomey, J.) |
| 08/15/1994 | | Sentence imposed: 4 years 11 months MCI Concord to be served |
| | | concurrent with 93-0686 (3&6) and concurrent with any sentence now |
| | | serving; (Daniel F. Toomey, Justice) |
| 08/24/1994 | | Mittimus issued to MCI Concord |

### EVENTS

| Date | Session | Event | Result |
|------|---------|-------|--------|
| 01/04/1994 | Crim 1 (204 Worcester) | Hearing: Probation Surrender | Event canceled not re-scheduled |
| 01/12/1994 | Crim 1 (204 Worcester) | Hearing: Probation Surrender | Event canceled not re-scheduled |
| 08/12/1994 | Crim 1 (204 Worcester) | Status: Review by Session | Event held as scheduled |

A true copy by photostatic process
Attest:
Asst. Clerk

*Catherine Brennan*

92 0094C

# Commonwealth of Massachusetts

**WORCESTER, SS.**

Superior Court Department of the Trial Court, holden at Worcester, within and for the County of Worcester, for the transaction of criminal business, on the    First    *Monday of*    February

in the year of our Lord one thousand nine hundred and    ninety-two

## The Jurors for the Commonwealth aforesaid, on their Oath Present

## That    Leo G. Beatty

of    Fitchburg    in said County of Worcester,

on the    twenty-sixth    day of    September    in the year of

our Lord one thousand nine hundred and    ninety-one

at    Fitchburg    in said County of Worcester,

did unlawfully conspire with Leonard R. Beatty, ~~Denise M. Parker~~, Sherry Lee Hatch, and Pamela Funchess to traffick in Cocaine, a controlled substance as defined in Chapter 94C of the General Laws, in an amount of 28 grams but less than 100 grams.

A true copy by photostatic process
Attest:
    Asst. Clerk

A true bill.

*Catherine Brennan*

*Asst District Attorney.*

*Foreman.*

220

92 0094C

COMMONWEALTH

*vs.*

LEO G. BEATTY

## INDICTMENT.

CONSPIRACY TO TRAFFICK IN COCAINE

Worcester, ss. Superior Court.
Sitting A.D. 19 92. Returned by Grand Jury.
filed by order of Court. A.D. 19 92 and

A't'test.

Ass't Clerk.

221

# EXHIBIT 5

**BEATTY, Leo G.**
DOB: 5/30/58

1

| DATE: | OFFENSE: | COURT: | DISPO: |
|---|---|---|---|
| 9/27/91 | Poss Class B / Cocaine 91CR1926D | Fitchburg District | Cont to 12/5/91, Bound Over |
| | Poss to Dist. Class B / Cocaine 91CR1926C | Fitchburg District | Same |
| | Control Substance / School / Cocaine 91CR1926B | Fitchburg District | Same |
| | Trafficking Cont. Subs. / Cocaine 91CR1926A | Fitchburg District | Same |
| 10/29/91 | Assault & Battery 91CR1406D | Leominster District | Cont to 2/25/92, Dism |
| | Property Violation / Malicious Dest. (2 counts) 91CR1406B&C | Leominster District | Same |
| | B & E (night) w/Intent to Commit Felony 91CR1406A | Leominster District | Same |
| 12/9/91 | Disturbing the Peace 91CR1824A | Leominster District | Same |
| 12/16/91 | Abuse Prevention Act 91CR1870A | Leominster District | Cont to 2/25/92, Dism |

**BEATTY, Leo G.**
DOB: 5/30/58

2

| DATE: | OFFENSE: | COURT: | DISPO: |
|---|---|---|---|
| 12/16/91 | Assault & Battery 91CR1863A | Leominster District | Guilty Probation to 12/16/92, Violation of Probation, 6/24/92 Default, Default Removed 7/6/92 Probation Revoked, 6 Months HOC, Committed |
| 1/29/92 | Assault & Battery 91CR152A | Leominster District | Cont to 2/20/92, Not Guilty |
| 2/24/92 | Poss To Dist. Class B / Cocaine 920094F | Worcester Superior | Cont to 6/25/92 Not Guilty |
| | Poss Class B Cont. Subs / Cocaine 920094E | Worcester Superior | Same |
| | Control Subst School / Poss Dist B 920094D | Worcester Superior | Same |
| | Conspiracy to Violate Control Subs. Act/ Trafficking Cocaine 920094C | Worcester Superior | Cont to 11/30/92 Guilty 5 Years Split Sentence, Committed 30 Days Balance Suspended Sentence to 11/30/94 VWF, Court Costs to 8/15/94 Violation of Probation Committed 5 Years |
| | Control Substance / School Trafficking Cocaine 920094B | Worcester Superior | Cont to 6/25/92, Not Guilty |
| | Trafficking Control Substance / Cocaine 920094A | Worcester Superior | Same |

**BEATTY, Leo G.**
**DOB: 5/30/58**

3

| DATE: | OFFENSE: | COURT: | DISPO: |
|-------|----------|--------|--------|
| 3/2/92 | Disorderly Person 92CR293A | Leominster District | Cont to 8/5/92 Guilty, File, VWF |
| 4/10/92 | Abuse Prevention Act 92CR0721A | Leominster District | Cont to 6/8/92 Not Guilty |
| 4/17/92 | Abuse Prevention Act 92CR0741A | Leominster District | Same |
| 5/19/92 | Property Violation / Malicious Dest. 92CR0917C | Leominster District | Same |
| | Abuse Prevention Act 92CR0917B | Leominster District | Same |
| | Assault & Battery 92CR0917A | Leominster District | Same |
| 6/10/92 | Abuse Prevention Act 92CR1088B | Fitchburg District | Cont to 7/2/92, Dism |
| | Assault & Battery 92CR1088A | Fitchburg District | Same |
| 6/8/93 | Assault & Battery 93CR1277A | Fitchburg District | Cont to 9/2/93, First Jury |
| 9/28/93 | Assault & Battery 93JC811A | Fitchburg Jury of Six | Dism |
| 10/15/93 | Poss to Dist. Class B 93CR2399B | Fitchburg District | Cont to 12/30/93, Dism, Indict |
| | Trafficking Cont Subs / Cocaine 93CR2399A | Fitchburg District | Same |

**BEATTY, Leo G.**
**DOB: 5/30/58**

4

| DATE: | OFFENSE: | COURT: | DISPO: |
|-------|----------|--------|--------|
| 12/14/93 | Conspiracy to Violate Cont. Subs. Act / Dist B, Cocaine 9306866 | Worcester Superior | Cont to 8/15/94 Guilty, Committed 5 - 7 Years |
| | Conspiracy to Violate Cont. Subs. Act / Dist B, Cocaine 9306865 | Worcester Superior | Cont to 8/15/94 Not Guilty |
| | Conspiracy to Violate Cont. Subs. Act / Dist B, Cocaine 9306864 | Worcester Superior | Cont to 8/15/94, Dism |
| | Conspiracy to Violate Cont. Subs. Act / Traff Cocaine 9306863 | Worcester Superior | Cont to 8/15/94 Guilty Committed 5 - 7 Years |
| | Distrib / Dispense Class B, Cocaine 9306862 | Worcester Superior | Cont to 8/4/94 Guilty Committed 9 - 10 Years |
| | Trafficking Control Substance / Cocaine 9306861 | Worcester Superior | Cont to 8/4/94 Guilty Committed 19 - 20 Years |

**RESTRAINING ORDER:**

| | | | |
|-------|----------|--------|--------|
| 1/29/92 | Refrain from abuse Vacate / Stay away No contact Plaintiff: Sherry Hatch | Leominster District | Expired 7/6/92 |

80