UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA   )
                                   )
        v.                       )            Criminal No. 05-40021-FDS
                                   )
LEO BEATTY                )

**SENTENCING MEMORANDUM**

Defendant Leo Beatty submits this sentencing memorandum to assist the court in determining the appropriate sentence.  For the reasons set forth in detail below, the court should sentence Mr. Beatty to a total term of incarceration of 60 months.  That sentence is "sufficient, but not greater than necessary" to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2).  It is a sentence that reflects the seriousness of the offenses of conviction, promotes respect for the law, provides just punishment, affords adequate deterrence and protects the public from further criminal conduct by Mr. Beatty.  A longer term of incarceration would be greater than necessary to accomplish those goals.

**Argument**

**I.     The Court Is Required To Impose A Sentence Sufficient But Not Greater Than Necessary To Comply With the Purposes Set Forth in 18 U.S.C. § 3553(a)(2)**

After *Booker*, a sentencing court must impose a sentence minimally "sufficient, but not greater than necessary, to comply with the purposes set forth in" 18 U.S.C. § 3553(a)(2).  18 U.S.C. § 3553(a).  *See also United States v. Foreman*, 436 F.3d 638, 643-44 & n.1 (6th Cir. 2006) ("a district court's mandate is to impose "a sentence sufficient, but not greater than necessary, to comply with the purposes" of section 3553(a)(2)"); *United States v. Cawthorn*, 419 F.3d 793, 802 (8th Cir. 2005) ("district

court's duty" is that it "shall impose a sentence sufficient but not greater than necessary"). The court is required to consider the following sentencing factors:

> **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> **(2)** the need for the sentence imposed--
>
>> **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> **(B)** to afford adequate deterrence to criminal conduct;
>>
>> **(C)** to protect the public from further crimes of the defendant; and
>>
>> **(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> **(3)** the kinds of sentences available;
>
> **(4)** the kinds of sentence and the sentencing range established for--
>
>> **(A)** the applicable category of offense committed by the applicable category of defendant as set forth in the [United States Sentencing G]uidelines--
>>
>> …
>
> **(5)** any pertinent policy statement--
>
>> **(A)** issued by the Sentencing Commission …
>
> **(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> **(7)** the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

A 60-month sentence would be consonant with all of the sentencing factors set forth in § 3553 and would recognize that Mr. Beatty is a flesh and blood individual who stands before the court at a particular point in his unique life. Even when the Sentencing

Guidelines were mandatory, the First Circuit Court of Appeals emphatically emphasized that this should be the goal of a sentencing judge:

> [T]he guidelines provide uniformity, predictability, and a degree of detachment lacking in our earlier system. This too must be remembered, however. It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue.

*United States v. Olbres*, 99 F.3d 28, 36-37 (1st Cir. 1996) (citation omitted).

### A. A 60-Month Sentence Is Appropriate Given the History and Characteristics Of the Defendant and the Nature And Circumstances Of the Offense

#### 1. The History and Characteristics of Mr. Beatty

Mr. Beatty is a most unusual defendant. He shares few qualities with the vast majority of defendants who stand before the court to be sentenced for drug distribution offenses, or who face the possibility of mandatory-minimum or career offender sentencing exposure. To be sure, he shares some similarities – prior convictions for drug distribution and the potential for sufficient drug weight to trigger mandatory-minimum sentencing. The similarities end there. The differences are significant.

First, Mr. Beatty did not sell drugs for a living. Unlike the vast majority of defendants who face career-offender and/or mandatory minimum sentences for drug crimes, Mr. Beatty did not decide to abandon a traditional and legal lifestyle and devote himself to a life of crime. He had a legitimate job up to the date of his arrest, a job he had held for nine months. *See* PSR at ¶ 144. He had held his previous job for almost three years. *Id*. at ¶ 146. That was a job he had obtained while on pre-release from a previous sentence he had served.

3

Second, Mr. Beatty constantly strived to better himself and to improve his ability to contribute to society and lead a law-abiding life.  After leaving high school (he would later obtain a high school diploma), Mr. Beatty enlisted in the army.  After serving for over five years, from 1977 through 1982, Mr. Beatty was honorably discharged.  He spent most of his tour of duty in Germany where he learned communications systems and worked for the Army and Air Force Exchange Service.  *Id*. at ¶¶ 140-142.  Mr. Beatty achieved marksman status with an M-16 rifle, expert status in the use of hand grenades and received the Good Conduct Medal, Army Service Ribbon and Overseas Service Ribbon.  *See* DD Form 214, Certificate Of Release Or Discharge From Active Duty, attached hereto.  Mr. Beatty left the army in 1982 and worked various legitimate jobs in the United States for the next nine years.  His first arrest was not until 1991.  He was 33 years old.

Third, Mr. Beatty has a stable family life.  He has been married since 2001 and has one son.  He met his wife Barbara in Germany and has been in a relationship with her for almost two decades.  Mr. Beatty expects this relationship to continue.  Upon his release from whatever sentence the court imposes, it is his intention to move to Germany with his family.  *Id*. at ¶¶ 124-127.

Fourth, Mr. Beatty is well past prime crime committing age and is far older than most drug defendants the court sentences.  At 48, some would call him old, period.  He will be 57 on release if the court were to impose a ten-year sentence – 64 if the court were to impose the low end of the guidelines as calculated by Probation.  He has spent more than seven years behind bars already and is on parole from a lengthy state court sentence.

Mr. Beatty spent the first 33 years of his life serving his country, working hard, contributing to society and abiding by the law. He was well along the same path prior to his release – holding down jobs and making ends meet. But for the government's informant getting hold of Mr. Beatty and enticing him to get involved in drug sales, Mr. Beatty would have stayed on that path.

### 2. The Nature and Circumstances of the Offense

A review of discovery provided by the government indicates that Mr. Beatty was a reluctant participant in four transactions with an undercover agent that were brokered by a confidential informant.

It took a week, from February 3, 2005 to February 10, to set up and consummate the first sale, which involved the relatively small quantity of 5 grams. Mr. Beatty initially rejected the efforts of the undercover and the informant to increase the size of the deals, refusing in a recorded call on March 3, 2005, for example, to provide a full ounce.

Mr. Beatty did not have quantities on hand and frequently had to delay sales to the undercover so that he could purchase the weight the undercover wanted. He indicated in calls recorded on March 17, 2005 that he was all out and needed to buy powder cocaine to cook for the sale to the undercover. Mr. Beatty indicated in another call recorded on May 6 that the undercover should let him know ahead of time so he can acquire the quantity from his source and explained in a call recorded on May 9 that he would have to order the quantity the undercover wanted and cook it. Transcripts of calls recorded by the DEA between May 5 and 9 2005 are attached hereto.

When Mr. Beatty offered to sell powder cocaine, the undercover insisted that Mr. Beatty provide cooked cocaine. *See* Transcript of May 6, 2006 call at 2, attached hereto.

5

Mr. Beatty resisted the undercover's repeated efforts to trade marijuana for cocaine base. *Id*. Mr. Beatty made it clear in the recordings that he was not a marijuana dealer and had no interest in becoming one.

Finally, Mr. Beatty resisted the informant's repeated efforts to persuade Mr. Beatty to deal directly with the undercover agent. In a call recorded on May 5, 2005, Mr. Beatty stated that he did not want to get directly involved with the undercover and was uncomfortable dealing with him.

In contrast to the typical drug-dealing defendant that comes before the court – one who deals drugs for a living by choice – Mr. Beatty did not leap at each and every opportunity to make a buck or provide ever-increasing quantities. It was not for lack of trust or extraordinary vigilance. The government's recordings indicate just the opposite – Mr. Beatty knew the informant well and agreed to conduct the transactions for that reason. Nor did he have quantities of cocaine base at the ready for whoever happened to call. Instead, he had to go out and get what the informant and the undercover wanted and cook it into powder before making the transactions.

### 3. A 60-Month Sentence is Sufficient But Not Greater Than Necessary To Comply With The Sentencing Factors Set Forth In 18 U.S.C. § 3553(a)(2)

A 60-month sentence is sufficient to promote respect for the law, to provide just punishment for the offense and to afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553 (a)(2)(A) and (B). It is also more than sufficient to specifically deter Mr. Beatty from committing another crime.

Mr. Beatty exhibits many of the characteristics that the Sentencing Commission has identified as indicators of reduced rates of recidivism. He is 48 years old, has a high

school education, military service, a stable employment history, is married with a family

and is a non-violent offender who does not *use* drugs.  Two recent studies conducted by

the Sentencing Commission, entitled Measuring Recidivism:  The Criminal History

Computation of the Federal Sentencing Guidelines (hereinafter "Release 1"),

http://www.ussc.gov/publicat/Recidivism_General.pdf; and A Comparison of the Federal

Sentencing Guidelines Criminal History Category and the U.S. Parole Commission

Salient Factor Score (hereinafter "Release 2"), http://www.ussc.gov/publicat/

RecidivismSalientFactorCom.pdf, include the following findings:

- Age:  "Recidivism rates decline relatively consistently as age increases," from 35.5% under age 21, to 9.5% over age 50.[1]  Under the Parole Commission's Salient Factor Score (SFS), which is a better predictor of recidivism than Criminal History Category, the older the defendant is and the fewer the number of prior commitments, the less likelihood of recidivism.  Age is a powerful component of recidivism prediction, which the Guidelines do not take into account.[2]

- Employment:  Stable employment in the year prior to arrest is associated with a lower risk of recidivism.[3]

- Education:  Recidivism rates decrease with educational level (no high school, high school, some college, college degree).[4]

- Family:  Recidivism rates are associated with marital status (never married, divorced, married).[5]

---

[1] Release 1 at 12 & Exhibit 9.

[2] Release 2 at 8, 13-15.

[3] Release 1 at 12 & Exhibit 10.

[4] *Id.* at 12 & Exhibit 10.

[5] *Id.* at 12 & Exhibit 10.

- Illicit drug use: offenders using illicit drugs within one year prior to their instant offense have a higher recidivism rate (31.0%) than those not using illicit drugs (17.4%).[6]

- Non-Violent Offenders sentenced under the fraud, larceny and drug guidelines are the least likely to recidivate.[7]

The court must know that, whatever sentence it imposes, this is the end of the line for continued criminal conduct by Mr. Beatty.  His history and characteristics, the nature and circumstances of this offense and the Sentencing Commission's own statistics should leave little doubt that Mr. Beatty will not come before this or any other court on new charges.

### II.  The Court Cannot Calculate the Advisory Sentencing Guidelines For Crack Or Impose A Mandatory Minimum Sentence Because the Offenses Of Conviction Do Not Involve Crack Cocaine

### A.  The Powder Cocaine Advisory Sentencing Guidelines Apply

In 1993, the Sentencing Commission made clear that the enhanced provisions set forth in the Sentencing Guidelines for "cocaine base" apply only to "crack."  *See* U.S.S.G. § 2D1.1(c), Note (D) ("forms of cocaine base other than crack … will be treated as cocaine").  *See also United States v. Medina*, 427 F.3d 88, 92 n. 3 (contrasting statute prohibiting possession with intent to distribute "cocaine base" with the Sentencing Guidelines "that will sometimes suggest a higher sentence when a defendant is convicted under the statute.  Since 1993, the Sentencing Guidelines have specified that the term "cocaine base," as used in the Guidelines, means "crack.""); *United States v. Thomas*, Criminal No. 03-30033-MAP, Supplemental Statement of Reasons, March 14, 2005, at 2 ("since November 1, 1993, it has been clear that, where the Guidelines refer to cocaine

---

[6] *Id*. at 13 and Exhibit 10.
[7] *Id*. at 13 & Exhibit 11.

base for purposes of the enhanced penalty, they are referring <u>only</u> to the sub-type of cocaine base known as crack") (emphasis in original).

Mr. Beatty has not admitted to possessing with intent to distribute "crack." At the change of plea hearing, the court took Mr. Beatty's plea to possession with intent to distribute "cocaine base," as charged in the indictment. Unless and until the government meets its burden of establishing at the sentencing hearing that the substance was indeed "crack," the cocaine powder advisory Sentencing Guidelines apply. Should the court find that the total weight of all cocaine attributable to Mr. Beatty is between 50 and 100 grams, the Offense Level would be 16. The advisory Sentencing Guideline Range after a three-level reduction for acceptance of responsibility would be 24-30 months (Level 13, CH Category IV). If the court were to agree with the Probation Office that Mr. Beatty is a career offender and that the Offense Level is 34, the sentencing range after a three-level reduction for acceptance of responsibility would be 188-235 months (Level 31, CH Category VI).

### B.  The Statutory Mandatory Minimum Does Not Apply

Courts of Appeal for the Fourth, Seventh, Eight, and Eleventh Circuits have held that Congress intended that the increased penalties applicable to cocaine base in 21 U.S.C. § 841 apply only to "crack cocaine." *See* canvas of cases in *United States v. Edwards*, 397 F.3d 570, 575-577 (7th Cir. 2005). The Eleventh Circuit reasoned that there is no reason "to assume that Congress meant for 'cocaine base' to have more than one definition" and that Congress' construction of the term in the guidelines was intended to limit the reach of the statute as well. *United States v. Munoz-Realpe*, 21 F.3d 375, 378 (11th Cir. 1994).

9

Prior to the Sentencing Commission's 1993 amendment making clear that the enhanced penalty provisions of the guidelines for cocaine base applied only to crack, the Court of Appeals For the First Circuit had reached a contrary result. *See United States v. Lopez-Gil*, 965 F.2d 1124 (1st Cir. 1992).[8] Recently, the First Circuit would appear to have re-affirmed that view. *See Medina*, 427 F.3d at 92. Holding that the defendant was not entitled to a jury instruction that the government was required to prove possession of crack in order to secure a conviction of 21 U.S.C. § 841, the court held that the statute "regulates exactly what its terms suggest: the possession of any form of 'cocaine base.'" *Id*. The court noted that crack was but one form of cocaine base "and so is among the substances regulated by the statute, but the government is not required in a given case to prove that the substance is crack in order to secure a conviction under it." *Id*.

The precise issue of whether the enhanced penalty provisions of § 841 – the mandatory minimum and increased maximum sentences – are applicable to all cocaine base convictions or just to crack convictions has never been squarely presented to the First Circuit. Judge Ponsor, writing before the *Medina* decision, noted that the decisions of those circuits holding that § 841 should be limited to crack cocaine were better reasoned and predicted that the First Circuit would agree if directly confronted with the issue. *See Thomas*, *supra*, at 9-10.

Mr. Beatty agrees with Judge Ponsor and objects to the rulings of the First Circuit in *Lopez-Gil* and *Medina* to the extent those cases might suggest otherwise.

---

[8]     The Second and Third Circuits share the view of the First Circuit. *See United States v. Barbosa*, 271 F.3d 438 (3rd Cir. 2001); *United States v. Jackson*, 59 F.3d 1421 (2d Cir. 1995).

### III.    The Court Should Grant Mr. Beatty A Three-Level Adjustment For Acceptance of Responsibility

The government and the Probation Office concur that Mr. Beatty should receive two levels off of the advisory Guideline Offense Level for acceptance of responsibility. *See* PSR at ¶ 87.  The government and the Probation Office do not believe that Mr. Beatty should receive a third level off because "the defendant declined to acknowledge that the substance in question was the "crack" form of cocaine base and refused to admit to any particular weight."  *Id*. at ¶ 71.  From this, the Probation Office concludes that "awarding the third-point for acceptance of responsibility may not be appropriate."  *Id*.

This argument is foreclosed by the First Circuit's decision in *United States v. Talladino*, 38 F.3d 1255, 1265-66 (1st Cir. 1994).  The trial court in *Talladino* had held that the defendant had obstructed justice but was nevertheless entitled to a two-level reduction for acceptance of responsibility.  The trial court then withheld the third point because of the defendant's obstruction of justice.  *Id*. at 1262-63.  The First Circuit reversed and held that the third point could be withheld only if the defendant's notice to the government to plead guilty was untimely.  It reasoned that once the court had determined that the defendant had accepted responsibility, "the only relevant inquiry that remains is whether the defendant either: '(1) timely provid[ed] complete information to the government concerning his own involvement in the offense; or (2) timely notif[ied] authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently.'" *Id*. at 1266, *quoting* U.S.S.G. § 3E1.1(b).

*Talladino* was decided before Congress changed the guideline in 2003 to require that the government file a motion certifying that the defendant's guilty plea was timely.

11

Although the mechanism for awarding the third point changed, the criteria did not.

Availability is still determined by timeliness of the plea, which remains a separate inquiry

from whether or not the defendant has clearly demonstrated acceptance of responsibility:

> If the defendant qualifies for a decrease under subsection
> (a), the offense level determined prior to the operation of
> subsection (a) is level 16 or greater, and upon motion of the
> government stating that the defendant has assisted
> authorities in the investigation or prosecution of his own
> misconduct by timely notifying authorities of his intention
> to enter a plea of guilty, thereby permitting the government
> to avoid preparing for trial and permitting the government
> and the court to allocate their resources efficiently,
> decrease the offense level by 1 additional level.

U.S.S.G. § 3E1.1(b).

Neither Probation nor the government has asserted that Mr. Beatty's notice that he

would plead guilty was untimely. The government is not well placed to so-assert. Mr.

Beatty's guilty plea was the product of protracted discussion with the government. The

government set and extended a deadline for Mr. Beatty to give notice of his desire to

plead, which Mr. Beatty ultimately met. The government had no intention of preparing

for trial until after the deadline it had selected had passed without a plea. Significantly,

the court had not even set a date for trial as of the time Mr. Beatty gave notice of his

intention to plead. Any assertion that Mr. Beatty's plea was untimely would not hold up

to scrutiny. Any other reason for withholding the third point for acceptance of

responsibility would have no basis in law.

### Conclusion

For all of the foregoing reasons, the court should impose a sentence of 60 months.

That sentence is sufficient, but not greater than necessary, to satisfy the statutory

sentencing factors. Should the court determine that Mr. Beatty is subject to a mandatory-

minimum sentence of ten years, the court should impose that sentence.  Under no

conceivable set of circumstances would a longer sentence under the career offender

provisions of the advisory sentencing guidelines be appropriate in this case.

                                        LEO BEATTY
                                         By his attorney,

                                        /s/ *E. Peter Parker*
                                        E. Peter Parker
                                         B.B.O. #552720
                                        151 Merrimac Street
                                        Boston, MA  02114
                                        (617) 742-9099

**Certificate of Service**

        I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing
(NEF) and paper copies will be sent to those indicated as non registered participants on
September 27, 2006.

                                        /s/ *E. Peter Parker*
                                        E. Peter Parker

CAUTION: NOT TO BE USED FOR
IDENTIFICATION PURPOSES

THIS IS AN IMPORTANT RECORD
SAFEGUARD IT

ANY ALTERATIONS IN SHADED
AREAS RENDER FORM VOID

| DD FORM 214 1 JUL 79 | PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE. | CERTIFICATE OF RELEASE OR DISCHARGE FROM ACTIVE DUTY |
|---|---|---|

| 1. NAME (Last, first, middle) | 2. DEPARTMENT, COMPONENT AND BRANCH | 3. SOCIAL SECURITY NO. |
|---|---|---|
| BEATTY, LEO GORDON | ARMY/RA | 204  50  6112 |

| 4a. GRADE, RATE OR RANK | 4b. PAY GRADE | 5. DATE OF BIRTH | 6. PLACE OF ENTRY INTO ACTIVE DUTY |
|---|---|---|---|
| PV2 | E2 | 580530 | PHILADELPHIA PA |

| 7. LAST DUTY ASSIGNMENT AND MAJOR COMMAND | 8. STATION WHERE SEPARATED |
|---|---|
| 38TH ENGR CO USAREUR    E7 | FORT DIX NJ  08640 |

| 9. COMMAND TO WHICH TRANSFERRED | 10. SGLI COVERAGE |
|---|---|
| USAR CONTROL GROUP (REINF), ST LOUIS, MO 63132 | AMOUNT $ 35,000   ☐ NONE |

| 11. PRIMARY SPECIALTY NUMBER, TITLE AND YEARS AND MONTHS IN SPECIALTY (Additional specialty numbers and titles involving periods of one or more years) | 12. RECORD OF SERVICE | YEAR(s) | MON(s) | DAY(s) |
|---|---|---|---|---|
| | a. Date Entered AD This Period | 77 | 04 | 12 |
| P05B10 RADIO OPERATOR 05 YRS  03 MOS | b. Separation Date This Period | 82 | 12 | 07 |
| | c. Net Active Service This Period | 05 | 07 | 26 |
| | d. Total Prior Active Service | 00 | 00 | 00 |
| | e. Total Prior Inactive Service | 00 | 00 | 05 |
| | f. Foreign Service | 05 | 02 | 22 |
| | g. Sea Service | 00 | 00 | 00 |
| | h. Effective Date of Pay Grade | 82 | 10 | 12 |
| | i. Reserve Oblig. Term. Date | 83 | 04 | 06 |

| 13. DECORATIONS, MEDALS, BADGES, CITATIONS AND CAMPAIGN RIBBONS AWARDED OR AUTHORIZED (All periods of service) |
|---|
| MARKSMAN, M-16 RIFLE    EXPERT, HAND GRENADE    GOOD CONDUCT MEDAL    ARMY SERVICE RIBBON    OVERSEAS SERVICE RIBBON |

| 14. MILITARY EDUCATION (Course Title, number weeks, and month and year completed) |
|---|
| VOICE RAD*  5 WEEKS  (7708) |
| GERMAN  *  1 WEEKS  (77) |

| 15. MEMBER CONTRIBUTED TO POST-VIETNAM ERA VETERANS' EDUCATIONAL ASSISTANCE PROGRAM ☐ YES  ☒ NO | 16. HIGH SCHOOL GRADUATE OR EQUIVALENT ☒ YES  ☐ NO | 17. DAYS ACCRUED LEAVE PAID NONE |
|---|---|---|

| 18. REMARKS  IMMEDIATE REENLISTMENTS THIS PERIOD:  770412 TO 791217. CONTINUATION OF ITEM 14C  OF  CONTINUATION OF ITEM 14C  HEADSTART  /NOTHING FOLLOWS/ |
|---|

ADDRESS CODED
CPM-0
DATE: 06 MAY 1983

| 19. MAILING ADDRESS AFTER SEPARATION | 20. MEMBER REQUESTS COPY 6 BE |
|---|---|
| SCHUTZENBURL STR 5 | SENT TO  PA   DIR. OF VET |
| STUTTGART 7000/40, GE | AFFAIRS  ☒ YES  ☐ NO. |

| 21. SIGNATURE OF MEMBER BEING SEPARATED | 22. TYPED NAME, GRADE, TITLE AND SIGNATURE OF OFFICIAL AUTHORIZED TO SIGN |
|---|---|
| Leo C Beatty | H. J. TETTERTON CW2 USA CHIEF SEP DIV |

**SPECIAL ADDITIONAL INFORMATION** (For use by authorized agencies only)

| 23. TYPE OF SEPARATION | 24. CHARACTER OF SERVICE (Includes upgrades) |
|---|---|
| RELEASE FROM ACTIVE DUTY | HONORABLE |

| 25. SEPARATION AUTHORITY | 26. SEPARATION CODE | 27. REENLISTMENT CODE |
|---|---|---|
| PARA 16 AR 635-200 | LBM | NA |

| 28. NARRATIVE REASON FOR SEPARATION  DA MSG 221312Z   SEP 82 |
|---|
| SHORT LENGTH OF TIME REMAINING ON ACTIVE DUTY PRECLUDES REASSIGNMENT |

| 29. DATES OF TIME LOST DURING THIS PERIOD | 30. MEMBER REQUESTS COPY 4 |
|---|---|
| NONE | LCB   INITIALS |

**Outgoing call to cellular telephone (978) 235-0735**
**11:36 a.m. on 05-05-2005 (Exhibit N-285)**

**LB ("Leo") – Leo BEATTY**
**CS – (          ) – CS** ████████

| | |
|---|---|
| LB: | Hello. |
| CS: | Hey. |
| LB: | Yeah? |
| CS: | What's up Lee? |
| LB: | What's up? |
| CS: | You sound like you tired. |
| LB: | Who's this? |
| CS: | ████████ |
| LB: | What's up ████? |
| CS: | Listen, this dude's… this dude's been trying to get a hold of me, and he can't get a hold of me. (coughs) You… you noticed I haven't been calling you, right? |
| LB: | Uh huh. |
| CS: | Um… He must know who gets… cause he's been going through other people and getting it and getting ripped off. He was wondering if he could call you, 'cause he wants… you know… he wants to make that exchange with that weed thing. |
| LB: | Um… I don't want the weed right now, so… |
| CS: | You don't want it now? |
| LB: | Not yet. No. |
| CS: | He wants to know if he can… if he could call you, 'cause he… he… he ain't been doing nothing but getting ripped off 'cause I ain't been coming out here. |
| LB: | I don't know. I mean, I really don't know the guy like that, Tony. You know what I mean? |
| CS: | Yeah, but I'm giving you my… Leo, I'm giving you my word. He's okay. I'm serious. I'm giving you my word. He's… he's fine. I mean, I sat down and smoked with him. You know what I mean? |
| LB: | Well who else knows him? |
| CS: | Just think back when… well, Donna knew him. You know? That's when… |
| LB: | Donna? |
| CS: | That girl, Donna. Yeah, you used to sit down there over on Snow Street and smoke with her. I used to buy the weed from him over on Snow Street. |
| LB: | Hmmm… |
| CS: | Alright Leo, I told you back a long time ago… up in New Hampshire? |
| LB: | Hmm… Well, I… |
| CS: | He's cool. |
| LB: | Ah…. I don't know why I feel so uncomfortable with the guy. I don't know why. |
| CS: | I mean, come on. Why? Because he's part of a motorcycle gang? |
| LB: | No, I don't think that… You know? |
| CS: | But I'm telling, he's cool. He's part of a motorcycle gang and everything. Know what I mean? And definitely cool. |
| LB: | Yeah, alright. |

108

CS:   Okay. So, he... he can call you? But, you... you don't need the weed, huh?
LB:   No, I don't need it right now.
CS:   Right now? Okay. Well, if you... if you're telling me, I'll tell him he can call you. He's tired of getting ripped off.
LB:   Alright then. Do I need to check with him through other people?
CS:   Huh?
LB:   Why is he off to another place, he thinks getting a better deal or something?
CS:   Well, no. He's getting ripped off by other people. I mean... sometimes they don't even... you know... you know... how... how... how... how the dudes up in New Hampshire ride around, giving people their money, and they... all the sudden gone?
LB:   Yeah, okay.
CS:   (laughs) You know how it is.
LB:   Alright.
CS:   Alright.
LB:   Who you talking to?
CS:   Huh?
LB:   Who's there with you?
CS:   There's nobody here with me. Ain't nobody talking. Only been...
LB:   Oh, okay.
CS:   Ain't no body talking. Alright?
LB:   Alright. Alright dude.
CS:   Alright. Bye.
LB:   Bye.

2

**Outgoing call to cellular telephone (978) 235-0735**
**11:50 a.m. on 05-06-2005 (Exhibit N-309)**

**LB ("Leo") – Leo BEATTY**
**SS ("Steve") – S/A Steven Story**

LB:     Hello.
SS:     Hey Leo, this is Steve from New Hampshire. ████'s friend.
LB:     Who?
SS:     Steve from New Hampshire. You know... ████s...████'s buddy.
LB:     Oh, yeah, yeah, yeah. What's up?
SS:     Hey, how are you doing dude?
LB:     Alright.
SS:     Hey, I'm sorry I haven't seen you for a long time. I kind of had a hard time hooking up with ████ here and there and then... you know... I had to find him to find you.
LB:     Uh huh, uh huh, uh huh.
SS:     And then I ended finding... there's another dude, a Spanish kid, I was... I was getting a good price off of basically... ah, you know... spending the same fifteen, but I was getting a whole... a whole one. You know?
LB:     Ah huh.
SS:     Um... But, he... he took off... he was in... he was living up in New Hampshire, but he's fucking gone back to New York or some bullshit so...
LB:     Okay.
SS:     But anyways, I was... I'm going to be heading way up north... you know... going up to Maine and... ah... grabbing... grabbing something this weekend...
LB:     Ah huh.
SS:     And... ah... I wasn't sure if you still wanted to... ah... work out...
LB:     Well...
SS:     ... a trade or something on Monday.
LB:     Uh huh... Yes. Ah, I kind don't... hmm... I don't know... I... I... that's what I was thinking, I... I... you know... that's a touch and go thing with me. You know what I mean?
SS:     Is it? You can't move it that good?
LB:     Ah...no, 'cause I'm... I'm... you know, I'm going with certain other things. You know what I mean?
SS:     Yeah. Um...
LB:     I... I... I... (unintelligible)
SS:     What's that?
LB:     Like, (unintelligible) I can you, like the whole things, right?
SS:     Yep
LB:     But... but... (unintelligible due to poor cellular connection), you know what I mean?
SS:     Nope, I... I... I lost you there, I was in a bad... a bad site, or you were. Can you hear me at all?
LB:     (Unintelligible)

1

SS:     Hey, I'm going to call you... I'm going to call you right back. I'm on a bad cell right here.

LB:     Okay, Steve.

SS:     I'll call you right back.


LB:     Hello.

SS:     Hey Leo, Steve again.

LB:     Okay.

SS:     Hey dude, I get the worst friggin cell service up in New Hampshire. It blows.

LB:     Oh...

SS:     Um...

LB:     Yeah, like I said, I can get you... I can get you, like almost the same deal, right? But it will be all powder, though.

SS:     Oh, it will, no shit.

LB:     Yeah, see that's the thing.

SS:     No, see, I thought yours was cooked perfect. You know? The other... I was getting a full "z" of the cooked from the other kid... you know... but, it was decent...

LB:     What was it like?

SS:     Decent, not... not... not as good as yours had been... you know... but I....

LB:     But you know what? I tell you something too, though. You know, so you get a better understanding of what's the differences. You ever look... you noticed how mines go, right?

SS:     Yeah.

LB:     When you burn ours, all real, real oily, with residue and all that stuff like that?

SS:     Yeah.

LB:     Because I do it, I cook it twice.

SS:     Oh, you do? No shit.

LB:     Yeah, see, a lot of people... I'm gonna tell you now, like you're think the dude is giving you a good deal....

SS:     Yeah.

LB:     But what they do, they run it through the first cook, and it swells... what happens is it swells with the baking soda.

SS:     Oh, fuck.

LB:     So, it looks like yellow. And it's going to weigh way more then baking... its heavier than the stuff itself.

SS:     Yeah, yeah, 'cause this shit looks kind of like popcorn. You know?

LB:     Exactly. And that's what... you know... one day, I'll... I'll show you how it's done...

SS:     Yeah.

LB:     And you'll be like, "Oh shit, that's what's happening."

SS:     Oh, okay. I see how... I thought it was good 'cause I was getting another eight... you know... 'cause...

LB:     Yeah, yeah, but... yeah, but... you know, it's not what you think you're getting. And sometimes... a lot of times... well, you going to have to re-cook it.

111

SS:    Ah... geez.

LB:    Well, I can show you how to do that, but, I mean, I... I... I don't... you know... Tony forces it because I always do the things the right way.   My... my... sometimes, my price seems a little steep, but I'm always correct.  But I'll always tell a person, if they don't like it... do you know what I mean?

SS:    Yeah.

LB:    You can always turn it back in.

SS:    No, I never... you know... I never had any problems it, except for that... you know... one time when it was a little short, but that was no big deal 'cause it...

LB:    Yeah, but no, no, no... I... I... I... I... I'm gonna tell you.  I gave Tony the whole thing.

SS:    Yeah?

LB:    He took... he quick handed you. That's what happened.

SS:    Oh, really?

LB:    You know, so....

SS:    Oh, that's fucked up because I take care of him on my end too.

LB:    Yeah, but you... you... come on.

SS:    (laughs)

LB:    I... ah... I mean, between me and you, but I didn't want to say nothing. You know what I mean?

SS:    Yeah.

LB:    You know, I was... I was kind of stuck in the middle.

SS:    Yeah.

LB:    You know what I mean? But I... I... you know, I... I... I even took care of him a little bit on my end, 'cause I... 'cause I didn't want him to do that.

SS:    Alright. He was making out good all around.  I didn't even tell him about this other dude I was going to, because he was going to hound the shit out of me.  I mean, he... he's a good bastard, but he...

LB:    Yeah, alright, but see the thing of it is though, is that I... you know... I've seen a lot of times when I do things for people....

SS:    Yeah.

LB:    They turn around and cut the other person short.  I said, "you know." I say, "you think you're doing good, you know, but that makes it look bad for me."

SS:    Yeah.

LB:    People think I'm doing it lazy. Like, oh, don't worry about it, they going straight and I'm like, alright, whatever.

SS:    (laughs)

LB:    You know?

SS:    Yeah.

LB:    Hey, could you hold on a minute?

SS:    Yep.

LB:    Oh, never mind.  I missed the call anyway.

SS:    Oh, sorry about that.  Yeah, so, uhm... you think, I mean, I was... the way I'm grabbing this... this green is beautiful now.  It's coming in even better than before, uhm...

LB:    Uh hmm.

SS:    It's in… it's in vacuum-sealed, one pound bags. But… you know… it's already bagged up as one, and it's… and it's vacuumed sealed up there. You know?

LB:    Uh huh.

SS:    Um… so we're not cut… we're trying not to cut into them because as soon as you cut into the bag… you know… how…

LB:    Right. It swells up.

SS:    Yeah, it swells and you lose your freshness and shit, and then some… then people don't want it if it's… if they've seen it cut into, unless you're cutting it up smaller than that, you know?

LB:    Right, right, right.

SS:    But… uhm… I was thinking I could do a one-for-one trade… you know… if you wanted that much. If you wanted a pound or two… um….

LB:    No, I… I… I really… I don't move it like that. You know, I just have a few dudes that ask me. You know what I mean?

SS:    Yeah, it's too much 'cause it would…. it would go stale, huh?

LB:    Yeah, so I mean, I would be holding on it forever.

SS:    Yeah, you don't want to do that with this shit cause it's… it's… it's so high end… you know… you want it to be nice and fresh, 'cause it's not like commercial stuff, you can just sit around on. You know?

LB:    Right, right, right. See that's the thing, I don't have no people like that, so….

SS:    Um… okay. So… um… that's probably… that probably wouldn't do you any good then.

LB:    No. But I mean… I don't know. I'm trying to work something with people… but no… that's… that's… that's the real deal. When I gave you, like I said, when you break mine, it's always real, real, real hard…

SS:    Yeah, it is.

LB:    … and it's solid all the way through.

SS:    Yep.

LB:    Like I said, because I cook it twice to make sure everything is out of it. That it's nothing but pure oil. As a matter of fact, you can take it and rub it in your fingers….

SS:    Yeah.

LB:    Right, and you get it oily, then it'll dry and turn real hard again right in your hand.

SS:    Oh, nice. Yeah, I thought I was doing good at first with this kid, he's a young, Spanish punk. He came to Milford… do you know, Milford… ah… up in…not too far away?

LB:    Yeah, yeah, yep, yep, yep, yep, yep.

SS:    He moved up there for awhile and he was, living large 'cause he… you know… he came into town and… and, you know… he was able to knock "z's" out and shit, but then I… you know… started to get a little aggravated because, like I said, the popcorn is… ah… a little lame.

LB:    Yeah, how will… what about the stuff that you was grabbing from me, though, how was that?

SS:    That was great. You know, that was real good. I just… um… I should have stuck with it, probably… you know… I thought since I was going to be getting eight more… you know… eight more… ah… through him.

LB:  Right. But it's not really, like, what you…what you… what you think it is.

SS:  Right. Right.

LB:  You know what I mean?

SS:  Um…

LB:  Like I said, I never had any… I mean, come on, 'cause some people come all the way from over there to come grab it from me. You know what I mean?

SS:  Yeah, yeah.

LB:  You know? I still have people from up your way coming down here.

SS:  Oh, that's good, that's…

LB:  And you know what, the… the thing of it is, they come, even if… even if… even if they just getting a hundred dollar piece, they come all the way down here for it.

SS:  Wow.

LB:  But they say, "I'd rather make the trip and get something I know is going to be worth it, then to throw my money away up there."

SS:  Oh, right… no that's… that's true, I mean, you can… you can get ripped off in many different ways and it pisses you off for a long time. You know?

LB:  You're right. And in the end, you wind up losing.

SS:  Yep.

LB:  You know? Oh, like I said, I….

SS:  What's that?

LB:  I… I'll… I'll try to work with you… you know, get you a little more for your money. You know what I mean?

SS:  Yeah, what's… what's the best I could stretch… ah… for fifteen, you think?

LB:  (sigh)

SS:  'Cause we were doing twenty before and…

LB:  I'll tell you what you do.

SS:  What's that?

LB:  I'll make it even better for you.

SS:  Yep.

LB:  For… for… let's see what I do. I'll tell you what I'll do, for… for sixteen-fifty?

SS:  Yep.

LB:  I'll give you twenty five.

SS:  Oh, okay. Nice. Nice.

LB:  So you're only paying… you're getting five more for a hundred and fifty dollars.

SS:  Oh, man, can't go wrong with that. That is good. Okay.

LB:  I'll give you twenty-five, how does that sound?

SS:  That's… that's good. Do you think I can grab that on Monday?

LB:  Ah… yeah, but let me know ahead of time, so I can grab it for you.

SS:  Okay, yeah, you know what I… I'll definitely come down… ah… I'll definitely come down on Monday. Ah… I'm only working until… ah… one, so I could… so I'll change and I could come down there. Can I… can I hit you up at like two or so?

LB:  Ah…yeah.

SS:  That'll be good?

LB:  Yeah.

SS:    Okay, cool.  I'll call you... I'll call you when I'm coming down.  Um... when...
       when I'm... when I'm on the road.
LB:    Alright, so you want me to do that for you?
SS:    Yeah, that'll be beautiful.
LB:    Yeah, 'cause, I mean, you... you're close to a whole thing.
SS:    Yeah.
LB:    You know your shit's gonna be good.
SS:    And I'll... ah... I'll take care of Tony on it... you know... 'cause I don't want to
       fuck him.  I'll take care of him afterwards when I finally... you know... track him
       down and shit... you know... But...
LB:    Right.
SS:    ... that it'll be easier than him hitting you and hitting me.
LB:    Yeah.
SS:    (laughs) He's good at working everything.
LB:    Yeah, that's Tony though.
SS:    Until I...ah... I won't even mess...I won't even mess with bringing the green
       down now.  I'll just...I'll just turn some over for the cash and... ah...
LB:    Alright.
SS:    'Cause you can't... you can't dig into a whole one, right?
LB:    Ah... no, I can't.
SS:    Okay, cool.
LB:    It'll be too much... it'll be too much for me.
SS:    Alright.
LB:    I wish I could, but you know what I mean?
SS:    Yeah.
LB:    I just don't... I don't have the people for it.
SS:    Alright.
LB:    Maybe down the road, what... what I'll....what I'll do is I'll start asking around
       and maybe I'll be able to do it.
SS:    Yep.
LB:    You know what I mean?  But as of right now, I won't be able to do that.
SS:    Cool, okay.
LB:    Alright.  So, I'll see you on Monday then, huh?
SS:    Yeah, that'll be a definite.  I'll call you when I'm... when I'm on the road.
LB:    Alright.
SS:    Awesome.  Thanks again.  Take it easy.
LB:    Alright then.
SS:    Yeah, bye.
LB:    Yeah, bye.

115

**Outgoing calls to cellular telephone (978) 235-0735**
**05-09-2005 (Exhibit N-309)**

**LB ("Leo") – Leo BEATTY**
**SS ("Steve") – S/A Steven Story**
**VM – Pre-recorded Voice Mail Operator instructions**

First attempt:

LB:    (Recorded voicemail message) Yeah, this is Big L. I'm not in right now. Ah… if you don't get me, it's either because I'm working, I'm sleeping, or I'm in an area where there's no signal.

Second attempt:

LB:    (Recorded voicemail message) Yeah, this is Big L. I'm not in right now. Ah… if you don't get me, it's either because I'm working, I'm sleeping, or I'm in an area where there's no signal. But leave a message and I'll get back with you. Thank you.

VM:    Please leave your message after the tone. Press "1" to send a numeric page. (Tone)

SS:    Hey yo, Leo, this is Steve. I'm just hanging out waiting. I just grabbed something to eat, grabbed a couple beers. We're gonna… ah… I'm gonna grab some shit in… ah… Wal-Mart. So, I'm gonna be up at… ah… Wal-Mart, just killing some time. Alright, give me a shout… when… when… ah…. when you're able to get it together. Um… it's 978 423 2068. I'll just be hanging out up there. Alright dude. Thanks. Talk to you later. Adios.

116

**Outgoing call to cellular telephone (978) 235-0735**
**12:40 p.m. on 05-09-2005 (Exhibit N-309)**

**LB ("Leo") – Leo BEATTY**
**SS ("Steve") – S/A Steven Story**


LB:   Hello.
SS:   Hey, Leo. This is Steve. From New Hampshire?
LB:   Yeah, what's up Steve?
SS:   Hey dude, how're you doing?
LB:   Alright.
SS:   Yeah, I... I just... ah... wanted to check in with you. I'm still... I'm still good for today.
LB:   Okay, I... I forgot I have an appointment today, right?
SS:   Oh, yeah?
LB:   I have an appointment in Burlington.
SS:   Oh, wow, no shit. What time do you got to go down there?
LB:   I got to be there for 2:15 is the appointment.
SS:   Oh, man. What time do you think you'll be back?
LB:   Oh, hopefully... hopefully, by four o'clock.
SS:   Oh, okay. I don't know if I can get down there that quick. Well, you got to... you got to be on the road early though, right, to get down there?
LB:   Yeah.
SS:   Shit. What time are you leaving there?
LB:   I getting ready to... I'm hopefully (unintelligible) I mean, what time... what's the latest you can come down this way?
SS:   Um... Well, I can... I can stall. I can come down later... you know... like, four or so.
LB:   Yeah, let's do that.
SS:   Oh, plan on four?
LB:   Yeah, call... call me around that time, and see... see what's... what's my situation.
SS:   Alright. That's cool. Yeah, 'cause I... um... I... that'll give me some time to unload some of the... ah... the green. You know? I... I got the money set aside for yours anyway, so...
LB:   Okay. Uh huh...
SS:   Alright dude. Um... alright, we'll shoot for four then?
LB:   Yeah, we'll shoot for that time.
SS:   Alright. Cool. Thanks.
LB:   Alright, good.
SS:   I'll call again. Bye.
LB:   Bye. Bye.

1

**Outgoing call to cellular telephone (978) 235-0735**
**4:15 p.m. on 05-09-2005 (Exhibit N-309)**

**LB ("Leo") – Leo BEATTY**
**SS ("Steve") – S/A Steven Story**


LB:    Hello.
SS:    Hey Leo, it's Steve.
LB:    Hey, what's up Steve?
SS:    Hey dude, how you… how are you making out?
LB:    I'm on my way back now.
SS:    Oh, okay, cool.  How long do think you it would take?
LB:    Oh… takes about… takes about fifty minutes to get back to Fitchburg.
SS:    Oh, no shit, you're that far out, huh?
LB:    Yeah, I'm out by… ah… by Peabody.
SS:    Oh, okay.  Um… alright… I'll… ah… so what… what does it look like, then…
       ah… like, four thirty or so?  Quarter of, what… what… let me see what time it is.
LB:    What time is it now?  What time is it?
SS:    It is… ah… shit, I always look at my cell phone.
LB:    What time were we looking at?
SS:    Uhm, yeah, it's four-fifteen… so… ah… Oh yeah, so its going to be after five
       then, huh?
LB:    Yeah.
SS:    Uhm, alright, do you want me to call you back at five?
LB:    Well, it'll be… it'll be after five.
SS:    Okay.
LB:    What I… what I got to do is I got to order it… I'll order it on my way in, when
       I'm close enough to order it.
SS:    Yep.
LB:    And then… I… um… then I got to make it for you.
SS:    Oh, okay.  You've still got to cook it, huh?
LB:    Yeah.
SS:    Ah… then I got to kill some time, then, huh?
LB:    No, it don't take that long to do that.
SS:    Okay.
LB:    Once I get it.
SS:    Alright.  I'll… ah… I'll call you back in an hour then or so, just to check in and
       see how things are going?
LB:    Alright.  That's good.
SS:    Alright.  Cool.  Alright, dude.
LB:    You want it definitely, right?
SS:    Oh, yeah.  Definitely.
LB:    Okay.
SS:    Yeah, 'cause we're just hanging out for it, cause we're… um….

1

118

LB:   Alright.
SS:   We're all done with dropping the other stuff.  You know?
LB:   Okay.
SS:   Alright.  Cool.  Alright. LB:  Okay.
SS:   See you.

119

**Outgoing call to cellular telephone (978) 235-0735
6:23 p.m. on 05-09-2005 (Exhibit N-309)**

**LB ("Leo") – Leo BEATTY**
**SS ("Steve") – S/A Steven Story**

LB:   Hello.
SS:   Yo Leo, its Steve.
LB:   Yeah, Steve. I'm just getting it ready for you now… I'm getting… getting it ready for you now.
SS:   Oh, cool, 'cause I'm just killing some time here.
LB:   Where… where are you?
SS:   Ah… at the Wal-Mart.
LB:   Oh, okay. It's gonna… I just got to get it ready.
SS:   Okay.
LB:   Alright?
SS:   Did you… did you catch the message? Do you want to call me back on that number?
LB:   Oh, no. I didn't get… I didn't check my messages yet 'cause I was in a hurry.
SS:   Oh, okay. I'll… ah… do you want me to call you back in a little bit?
LB:   Ah… yeah.
SS:   Okay. How much time?
LB:   Alright. Bye.
SS:   Alright. Bye.